**UNITED STATES of America**

v.

**Orenzo CHARLES, Defendant.**

**No. 72 CR 1284.**

United States District Court,
E. D. New York.

Dec. 19, 1973.

---

14. See Footnote 8.

Edward J. Boyd, V, Acting U. S. Atty., Brooklyn, N. Y., by Joan S. O'Brien, Brooklyn, N. Y., of counsel, for plaintiff.

Legal Aid Society, Federal Defenders Unit, Brooklyn, N. Y., by William Epstein, New York City, of counsel, for defendant.

## MEMORANDUM OF DECISION

MISHLER, Chief Judge.

■ Defendant was convicted after trial to the court on a charge of armed bank robbery of the Long Island Sav-

ings & Loan Association on July 12, 1972, in violation of 18 U.S.C. § 2113(a). He was sentenced under the Youth Correction Act pursuant to 18 U. S.C. § 5010(b). The sole question presented to the United States Court of Appeals for the Second Circuit was the voluntariness of a written confession made to F.B.I. Agents Baker and Mc-Cartin on November 15, 1972, at the New York City Housing Authority Police Precinct,[1] at 98th Street and Third Avenue, New York City. The Court of Appeals, by order dated October 9, 1973, remanded the case to the undersigned for " . . . findings as to whether defendant, at the time of questioning by Agents Baker and McCartin, was in custody or otherwise deprived of his freedom in any significant way." On November 7, 1973, this court held an evidentiary hearing on the issue.[2] The court finds as follows:

The bank manager, Edward Larson, observed the two bank robbers enter the getaway car and noted that it was a silver gray automobile bearing the registration number 734 OVJ. It turned out to be a silver gray Pontiac Grand Prix, reported stolen by its owner, Luis Chevez, about ten days prior to the robbery. In the course of the auto theft, Chevez's driver's license and some cash were taken. On July 14, 1972, the Pontiac Grand Prix was found abandoned at 74th Street and Riverside Drive in New York City. At approximately the same time a Ford Thunderbird was reported stolen near that location. On July 28, 1972, three men identified as Lenny Green (called Diamond), Allan Brown and Ronald Riddick were found in possession of the stolen Thunderbird when

---

1. Throughout this memorandum, the building in which the questioning was conducted will be referred to as a 'police precinct' or a 'stationhouse'. It has been variously described as a "squad room", "Housing Authority Building" and "Lexington Headquarters." The facility was not a conventional police precinct. Since the memorandum describes the exterior and interior of the structure and its function, the descriptive term used is of no consequence.

2. Prior to the trial, on February 13, 1973, the court had held a hearing on defendant's motion to suppress the confession. The court found the confession to have been voluntarily made (Tr. p. 74 of trial on February 13, 1973). The testimony of the hearing of February 13, 1973 is considered on the issue presently before the court, i. e., whether defendant "was in custody or otherwise deprived of his freedom" at the time of questioning.

they were arrested by police after a high-speed chase. Green confessed to the bank robbery and named one Robert Gonzalez as his accomplice. Gonzalez turned out to be fictitious.

On September 6, 1972, Detective Christopher Francone of the New York City Housing Police Authority arrested one Eddie Knox on a charge of possession of stolen property. A search of Knox's person resulted in the seizure by Detective Francone of a New York State driver's license in the name of Luis Chevez. On September 19, 1972, Knox was arrested on a charge of illegal sale of firearms by the Federal authorities. Knox told the authorities in an interview on October 2, 1972 [3] that he had bought the license from one Thomas Bruen (called Bo) during a party in the apartment of one Peter Annunziata, with Lenny Green also present.[4] Bruen, when later interviewed, (Government's Exhibit 16) stated that Knox had gotten the license from Green, not from himself. He said that Green often hung out with an individual called Orenzo ("Rennie") Charles, who lived at the Lehman Village Housing Project. Bruen was shown the surveilling photographs of the robbery. The individuals depicted wore halloween masks. He stated that the general characteristics of the robbers resembled Green and Charles, but he was unable to identify either on the photographs. Annunziata, interviewed on October 31, 1972, (Government's Exhibit 17), was unable to identify Charles from the bank surveillance photographs, although he felt the other individual was Green. He identified photos of Bruen

and Green as "Bo" and "Diamond" respectively.[5]

As a result of Bruen's comments that Green associated with Orenzo Charles and that the individuals in masks appeared to him to be Green and Charles, Detective Francone sought to interview defendant and went to the Lehman Housing Project at 116th Street and Park Avenue in New York City, where defendant resided with his parents. At this point, the investigation had not focused on Charles as *the* suspect, or even as a prime suspect.[6]

On November 13, 1972, Detective Francone called at defendant's residence, but defendant was not at home. Detective Francone advised defendant's father of his identity and of his desire both to speak to the defendant about some robberies and to have the defendant look at some mug shots which Francone had brought with him.[7] He assured the father that he did not intend to arrest the defendant. Detective Francone gave the father his telephone number with a request that defendant call him. Defendant failed to call, and Detective Francone returned the next day. Defendant's father advised Detective Francone that he had not heard from defendant. Again, Detective Francone assured the father that he only wanted information and did not intend to arrest the defendant. Defendant failed to call on Tuesday, November 14, 1972. Detective Francone telephoned the residence and received a promise from the father that defendant would call.

Defendant telephoned Detective Francone at the Housing Authority Police

---

3. See Government's Exhibit 18.

4. Knox was shown photos of Riddick, Green and Brown (the three found in the stolen Thunderbird) and identified Green as the one who had been at Annunziata's apartment.

5. Annunziata was unable to identify photos of Brown, Riddick and one Walter Wilson (who, in an interview on September 6, 1972, stated that Green had been involved in the robbery).

6. The fingerprints both on the counter at the bank and in the Pontiac Grand Prix had not been matched to Charles. The confession by Green did not point to Charles. Furthermore, Bruen's statement—the only connection of Charles to the robbery—was of questionable validity in light of the fact that another statement by Bruen, regarding how Knox got Chevez' license, conflicted with statements of Knox and Annunziata.

7. Tr. p. 73 of hearing on November 7, 1973.

Precinct on November 15, 1972, at about 5:00 P.M. Detective Francone asked defendant if he would come down to look at some mug shots and, if possible, identify some people believed to be involved in some robberies. Soon after this last telephone call, defendant appeared at the Housing Police Precinct with a girlfriend.

The court notes that defendant's acquiescence to the interview at the stationhouse was a voluntary and knowing choice. Detective Francone had originally brought the mug shots to defendant's home on November 13th, indicating a willingness to hold the interview at a place other than the stationhouse. At no point thereafter did Detective Francone ever insist that an interview had to be held and furthermore, that it had to be held at the Housing Authority Precinct. Defendant, prior to coming to the stationhouse, was informed by Detective Francone of the nature and subject matter of the interview. Thus defendant, at the time he voluntarily came to the stationhouse, knew that the line of inquiry would involve "some robberies." [8] In fact, defendant later stated that when he had come to the police station he knew what the questioning was probably about.[9]

Defendant, upon appearing at the Housing Authority Precinct,[10] was directed to Detective Francone's office on the second floor.[11] When defendant entered the office, Detective Francone identified himself and his partner, Detective Guskin. Detective Francone suggested that defendant's girlfriend wait outside the office.

While Detective Francone exhibited various mug shots in his mug shot book, he asked defendant whether he knew any of the individuals shown. The defendant was asked to go through the book to see if he recognized anybody. Defendant gave negative answers until Detective Francone returned to Bruen's photograph. Defendant then admitted he knew Bruen. He implicated Bruen in the robbery-kidnapping of Luis Chevez. He also implicated Bruen and one Willie Wright (called "Hollywood") in the robbery of a supermarket. Defendant implicated Bo (Bruen) and Diamond (Green) in the robbery of a supermarket in the Bronx. Defendant stated he was not implicated in any of these crimes and indicated he received his information from Bruen. Detective Francone asked defendant if he knew anything of the robbery of the Long Island Savings & Loan Association; defendant answered in the negative. In response to questions about Green's activities, defendant stated he had ridden in a Grand Prix with Bruen and Green and that in July, 1972, he had received $100.00 as repayment of a loan from Green. At this point, at about 6:00–6:30 P.M., Detective Francone left the room to call F.B.I. Special Agent Robert McCartin. In response to this call, Special Agent McCartin arrived at the Housing Authority Police Precinct with Special Agent William M. Baker about 8:20 P. M. When the agents arrived at the second floor they saw the defendant seated at a desk in the Manhattan Squad office, talking with Detective Francone. Other detectives were present, and all personnel were in civilian clothes. No one wore a badge or shield or displayed a weapon. Defendant walked into an adjoining office known as the Bronx-Queens Squad room. The room had chairs, filing cabinets and a desk. Defendant sat at the side of the desk; Special Agents Baker and McCartin sat at the front of the desk, and Detective Francone and his partner were in another part of the room doing work unrelat-

8. Tr. p. 77 of hearing on November 7, 1973.

9. Tr. p. 47 of trial on February 13, 1973.

10. The entrance of the precinct was lit by lamps on both sides of the door indicating that the premises were the 7th precinct.

11. The second floor was partitioned into a number of offices. This office was called the Manhattan Detective Squad Room.

ed to the Federal investigation. The door to the room was open during the questioning. At the time the questioning began, the agents believed that defendant might be able to supply information concerning the bank robbery. Furthermore, as an associate and friend of Green's, defendant was considered a possible accomplice in the bank robbery.

After advising defendant of his and Agent Baker's identity, Agent McCartin advised defendant that he wanted to inquire about the Long Island Savings & Loan Association robbery on July 12th. Defendant indicated he understood the purpose of the interview. McCartin then read a form incorporating the "Miranda warnings", at which point defendant proceeded to sign a waiver of his constitutional rights. Special Agent McCartin then advised him that he was free to leave at anytime and that he was not under arrest.

Defendant was not advised that Green had been identified as one of the robbers. The questioning first concerned his relationship with Green. Then, when asked pointedly whether he was involved in the robbery with Green, defendant denied it.[12] Special Agent Baker noticed the the defendant was wearing a shiny narrow metal bracelet similar to the one depicted on one of the robbers on the bank surveillance photograph. Baker further noticed defendant attempting to hide the bracelet from view by pushing it under his shirt sleeve. Defendant thereupon orally confessed his complicity in the robbery and signed the written confession upon which the conviction is based.

*Miranda* barred statements given without both advice of constitutional rights and warnings as to the consequences of the failure to exercise those rights during custodial interrogation.

*Miranda* defined custodial interrogation as " . . . questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. at 444, 86 S.Ct. at 1612.)

██ Interrogation by law enforcement officers is not usually pre-arranged or conducted pursuant to rules or regulations. Reported cases are of little aid in formulating a guide for classifying an interrogation as custodial or noncustodial except in the instance where a formal arrest has been made. Definition of custodial interrogation is on a case-by-case basis. United States v. Akin, 435 F.2d 1011 (5 Cir. 1970).

The United States Court of Appeals for the Second Circuit, in citing Mathis v. United States, 391 U.S. 1, 83 S.Ct. 1503, 20 L.Ed.2d 381 (1968), stated: "the court's opinion makes clear . . . that it is the custodial surrounding in which the questioning was conducted which creates the necessity for the warnings." United States v. Squeri, 398 F.2d 785, 789 (2d Cir. 1968). Defendant claims that his appearance at the police precinct was involuntary (Defendant's brief, p. 8), and that the interrogation was "incommunicado interrogation in a police dominated environment." (Defendant's brief, p. 10.) The evidence indicates that his appearance was voluntary. Defendant was aware of his guilt. While he may have had some doubt as to the wisdom of going to the precinct, the manner of his appearance—his friendly attitude and the presence of his girlfriend—indicated that he apparently felt that he could use the visit as an opportunity to divert suspicion of complicity in the various state crimes by charging Bruen with them. I find United States v. Har-

---

12. Special Agent Baker testified that it was at this point that defendant said, "I don't want to talk about it. I wasn't involved." Defendant argued on appeal that under Miranda v. Arizona, 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966), the defendant invoked his privilege against self-incrimination and that the subsequent questioning was the "product of compulsion" and rendered inadmissible, United States v. Collins, 462 F.2d 792 (2d Cir. 1972) rehearing en banc 462 F.2d 801 (2d Cir. 1972).

rison, 265 F.Supp. 660 (S.D.N.Y.) (.1967), cited by defendant, inapposite.[13] Stegeman v. United States, 425 F.2d 984 (9 Cir. 1970) is closer to the facts here.[14]

Defendant was a possible suspect. At the time of the questioning, McCartin and Baker did not have information that defendant was a participant in the robbery. They knew that he was associated with Green and that Bruen had said that his general appearance could fit the second robber in the surveillance photograph. The cross-accusations made by Bruen and defendant were not the type or quality of proof that responsible authority could act upon. At the time of the questioning and before defendant confessed, the defendant was not *the* suspect. The search for the accomplice was still on. The investigation of the bank robbery had not yet focused on the defendant, but rather included a number of people as the possible suspect.

In United States v. Hall, 421 F.2d 540 (2d Cir. 1969) cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), defendant, informed by F.B.I. agents as to the subject of their inquiry,

willingly let the agents into his apartment for questioning. Defendant was questioned extensively by the agents in his small three-room apartment regarding a bank robbery. At the time of questioning, the agents' only connection with defendant was the presence of defendant's automobile at the bank early in the morning during the bank robbery.

Despite the restricted size of the quarters where questioning was conducted, the number of officers and the extensiveness of questioning, the court nevertheless held that the questioning did not constitute custodial interrogation. The court in *Hall* felt that the lack of focus on defendant outweighed these other factors. 421 F.2d at 545. "Certainly the agents had 'focused' on Hall more than on all residents of [the township]; on the other hand, the focus was not so sharp that they had anything approaching certain, indeed even probable cause, to believe he was the robber." 421 F.2d at 543. Suspicion alone, resulting in official interrogation, did not, according to the court in *Hall*, constitute *custodial* interrogation.[15]

13. Two major areas of distinction exist between *Harrison* and the case before this court. First, the defendant in *Harrison* was not presented with a truly voluntary choice of whether or not to appear at the stationhouse. There the police came to defendant's home and gave defendant no alternative to stationhouse questioning. Furthermore, the request was made personally with a number of policemen present, hardly similar in atmosphere to the telephone communication used by Detective Francone. Second, the degree of focus on the defendant was far greater in *Harrison*. There the police wished to question defendant solely about *his* possible involvement in narcotics violations, based upon a connection with a police officer who had been charged with a narcotics violation. Detective Francone, on the other hand, had little evidence to focus on Charles, and in fact disclaimed any intent to make an arrest and furthermore sought merely to have Charles look at mug shots. These subtle distinctions bring to mind the observation in *Akin*, that the issue must be determined on a case-by-case basis.

14. In *Stegeman*, F.B.I. agents first interviewed defendant's wife at her home in Can-

ada and advised her of possible violations of the National Bankruptcy Act. Defendant and his wife had left the United States to reside in Canada. Two months later, defendant arranged to be interviewed by F.B.I. agents at a local office of the Royal Canadian Mounted Police. The court held that the interrogation was not custodial.

15. The degree of focus bears a correlation to whether the interrogation takes on investigatory or accusatory characteristics. 421 F.2d at 543–545. In fact, the Fifth Circuit, recognizing the 'focus plus' test, has repeatedly stated that the degree of focus is the most significant factor in determining whether a defendant is in custody. Brown v. Beto, 468 F.2d 1284, 1286 (5 Cir. 1972); United States v. Phelps, 443 F.2d 246, 247–248 (5 Cir. 1971).

Appellant's distinction of *Hall*, that the questioning there lacked any specificity of focus, is contrary to the facts in that case. In *Hall*, although the police lacked probable cause to believe defendant committed the crime, they did have reasonable grounds to suspect the defendant. His car had been reported at the bank during the robbery at

Detective Francone attempted to interview the defendant at home. The defendant chose to be interrogated at the police precinct. In United States v. Scully, 415 F.2d 680 (2d Cir. 1969), the investigating agent called the defendant and gave him a choice of interrogation at home or at a police precinct. The defendant chose the latter. Before the questioning he was advised that the interrogation concerned a bank robbery. The court held that the interrogation was not custodial.

"Appellant was not compelled by the police to go down to the stationhouse for questioning. . . . He decided to go to the station. Upon his arrival he was made aware of the fact that he was a robbery suspect, perhaps a prime suspect, but it is quite apparent that he was not made to feel that he was under any obligation or under any police pressure to answer questions, or that he would be forced to remain in the station until the officers completed their investigation of him." 415 F.2d at 684.

Interrogation is not custodial solely because it is conducted at the offices of law enforcement authorities, United States v. Knight, 261 F.Supp. 843 (E.D.Pa.1966) or at a police precinct, Hicks v. United States, 127 U.S. App.D.C. 209, 382 F.2d 158, 162 (1967). Nor is the interrogation custodial because the defendant is given the "Miranda" warning, United States v. Akin, *supra*.

The court finds that at the time of questioning by Agents Baker and McCartin, defendant Orenzo Charles was not in custody or otherwise deprived of his freedom in any significant way.

7:45 A.M. The car had been parked in a strange manner at the bank and the unidentified driver had behaved suspiciously. (The court was later made aware that the F.B.I. agents had had additional information prior to questioning the defendant. This knowledge was made known to the court through a motion by defendant in 1971 to vacate his conviction and sentence under 28 U.S.C. §

2255. The new evidence, however, was mixed as to its effect on changing the focus towards the defendant. Thus the trial court held that the information did not raise the level of suspicion sufficiently to alter the result and denied the motion. 333 F.Supp. 1069 (N.D.N.Y.1971). The Court of Appeals affirmed. 459 F.2d 454 (2d Cir. 1972)).