**UNITED STATES of America**

v.

**Arlo LEWIS.**

**Crim. No. H–76–97.**

United States District Court,
D. Connecticut.

Jan. 3, 1977.

---

Peter C. Dorsey, U. S. Atty., Albert S. Dabrowski, Thomas P. Smith, Asst. U. S. Attys., New Haven, Conn., for plaintiff.

Richard S. Cramer, Federal Public Defender, Hartford, Conn., for defendant.

## RULING ON DEFENDANT'S · PRE–TRIAL MOTIONS

BLUMENFELD, District Judge.

The defendant, Arlo Lewis, has been indicted for bank robbery, 18 U.S.C. § 2113(a). He has made several pre-trial motions which are the subject of this opinion.* The defendant has moved for release from custody pursuant to the Speedy Trial Act, 18 U.S.C. § 3164, and Section 10(a) of the Speedy Trial Plan for the District of Connecticut. A hearing was held on this motion on November 12, 1976. In addition, Lewis seeks to suppress three different statements made while he was in custody on the grounds that they were obtained in violation of the rights afforded him by the fourth, fifth, and fourteenth amendments and 18 U.S.C. § 3501. Hearings were held on this motion on November 2, 1976 and November 4, 1976.[1]

### I. *Findings of Fact*

On Saturday, July 10, 1976, two black males robbed the United Bank and Trust Company, Windsor, Connecticut. On July 16, 1976, a state warrant for the arrest of

---

* The rulings on these pre-trial motions were made in open court on December 9, 1976.

1. The defendant has also moved to suppress any evidence concerning photographic identifications. The defendant has not briefed this claim and apparently has abandoned it. In any event, nothing in the record supports his claim that the photographic spread was impermissibly suggestive. Therefore, this motion is denied.

Arlo Lewis was issued upon the affidavit of Windsor, Connecticut police officer Everett Laurence Overstrom. The supporting affidavit states that Overstrom investigated the robbery with Special Agent Harry Willis of the Federal Bureau of Investigation. It further states that Overstrom and Willis showed a spread of photographs to bank manager Joseph R. Luppachino, Jr., who identified Arlo Lewis as one of the bank robbers. Overstrom's affidavit does not disclose that photographs also had been shown to six other persons who were unable to identify anyone in the spread as being one of the robbers.[2]

On Saturday morning July 17, 1976, Windsor, Connecticut police officer Overstrom, Hartford officer Madison Bolden, and F.B.I. Special Agents Willis and David Miller arrested Arlo Lewis in his Hartford apartment, pursuant to the state arrest warrant. At that time, Lewis was orally given *Miranda* warnings, first by Overstrom and shortly thereafter by Special Agent Miller. Lewis said nothing in response to these warnings. On July 16, 1976, the night before the arrest, Lewis had been stabbed by his girlfriend during an argument. He received a wound the size of one centimeter in his chest. In addition, Lewis, 24 years old, has been a heroin addict for 11 years. He had not injected any drugs into his system on July 16. However, at the time of his arrest on July 17, he made no request for medical assistance.

Following his arrest, Lewis was taken by the state officers and F.B.I. agents from his Hartford apartment to the Hartford police station. At 9:41 a. m., in the "interrogation room" of the station, he was again given *Miranda* warnings by F.B.I. Agent Willis. At 9:44 a. m., Lewis executed an "Interrogation Advice of Rights Form," acknowledging that he understood his rights.[3] He stated that he "didn't want to say anything until [he] saw a lawyer."[4] After his statement, Special Agent Willis asked him when he had last seen Wayne Brown, his alleged accomplice. Lewis responded that he had seen Brown on July 10, 1976, the day of the bank robbery. No further questions were asked of Lewis at that time. During this encounter, the defendant made no requests for medical assistance. Following the interview, he was placed in a cell in the "lockup" of the Hartford police station.

At 2:30 p. m. that same afternoon, Lewis was taken to the Hartford Hospital where his chest wound was treated. The hospital's records do not indicate that he showed symptoms of suffering from withdrawal and do not reflect any complaints in that regard by Lewis.[5] At 3:30 p. m., he was returned to his cell in the "lockup" of the Hartford police station.

At approximately 5:30 p. m. that afternoon, Lewis initiated a conversation in the "lockup" area with Hartford police detective, Edgar Campbell, whom he knew from his neighborhood. Lewis began the conversation by asking Detective Campbell to give a message to his girlfriend. Campbell then asked Lewis what he was doing in the Hartford "lockup" and Lewis responded that he had been arrested for the Windsor bank robbery. During the course of the ensuing conversation, Campbell, who was not investigating the Windsor bank robbery, said that he had seen "a beautiful photograph of the bank holdup"[6] and that Windsor police officers had shown him a photograph of Lewis and said that they wanted him for the robbery. He urged Lewis to cooperate with the F.B.I. Lewis then admitted his participation in the bank robbery. At no time did Campbell give Lewis *Miranda* warnings. The conversation with Campbell concluded at approximately 6:15 p. m.

---

2. A stipulation was entered into by the parties concerning the facts surrounding Detective Overstrom's affidavit. Defendant's Exhibit 8. The arrest warrant and the supporting affidavit are Defendant's Exhibit 5.

3. Government's Exhibit 3.

4. Transcript at 72.

5. Transcript at 117–19.

6. Transcript at 199.

At the end of the conversation with Campbell, Lewis asked him to inform F.B.I. Agent Willis that he wanted to speak to him. Campbell was reluctant to call Special Agent Willis at home on a Saturday night, but he contacted the Windsor police who in turn contacted Special Agent Miller (not being able to reach Willis).

At 7:55 p. m., prior to Special Agent Miller's arrival, the doctor for the Hartford Police Department treated Lewis. The doctor gave him 20 milligrams of methadone. This is the doctor's usual treatment for narcotic addicts. His records do not reflect that Lewis was in extreme pain or in an advanced stage of withdrawal.[7]

At 8:20 p. m., Special Agent Miller arrived and advised the defendant of his rights. At 8:30 p. m., Lewis executed a second "Interrogation Advice of Rights Form."[8] During that 10-minute period, Special Agent Miller discussed the form with Lewis. In view of Lewis' earlier desire to consult with counsel, Miller wanted to assure himself that "Lewis realized exactly what he was doing."[9] Having noticed a hospital identification tag on Lewis' wrist, Miller inquired as to his physical condition. Based upon this discussion with Lewis, Miller concluded that the defendant was in full possession of his faculties.

Following the execution of the "Interrogation Advice of Rights Form," Lewis confessed to Miller about his participation in the bank robbery. These statements were transcribed, and, after reading them, Lewis signed them at 10:05 p. m.[10]

## II. *Motion for Release From Custody*

The defendant has moved for release from custody pending trial, pursuant to the Speedy Trial Act, 18 U.S.C. § 3164(b)[11] and Section 10(a)[12] of the Speedy Trial Plan for the District of Connecticut.[13] These provisions require that an accused be released from federal custody if he has been in continuous detention for 90 days without being tried. The defendant was arrested pursuant to a state warrant on July 17, 1976, and has remained in custody since that date. While he was not indicted and charged with a federal crime until September 17, 1976, and was not formally in federal custody until that date, the defendant argues that the 90-day period began on July 30, 1976, when the Assistant United States Attorney received the F.B.I.'s investigation report of this case.

The basis of the defendant's argument is that:

> "[t]he state arrest and detention [for the state crime of robbery in the first degree] serve only as a 'holding action' for the contemplated federal prosecution."[14]

He contends that the 90-day limit on detention awaiting federal trial will be circumvented unless the time he spent in state custody is credited.

---

7. Defendant's Exhibits 2 and 3; transcript at 39–40.

8. Government's Exhibit D.

9. Transcript at 227.

10. Government's Exhibits E and F.

11. 18 U.S.C. § 3164(b) provides:
    "During the period such plan is in effect, the trial of any person who falls within subsection (a)(1) or (a)(2) of this section shall commence no later than ninety days following the beginning of such continuous detention or designation of high risk by the attorney for the Government. The trial of any person so detained or designated as being of high risk on or before the first day of the interim period shall commence no later than ninety days following the first day of the interim period."

12. Section 10(a) of the Local Plan provides:
    "A defendant in custody whose trial has not commenced within the time limit set forth in 18 U.S.C. § 3164(b) shall, if the failure to commence trial was through no fault of the defendant or his counsel, be released subject to such conditions as the court may impose in accordance with 18 U.S.C. § 3146. Nothing herein shall require that a defendant in custody be released except as required by 18 U.S.C. § 3164(c)."

13. I denied this motion in open court on November 12, 1976. The present discussion is aimed at clarifying the basis for that ruling.

14. Defendant's Memorandum in Support of Motion to Release, November 2, 1976, at 2.

There is considerable merit to defendant's position. The federal authorities played a significant role in the state arrest and incarceration of the defendant. As Detective Overstrom's affidavit itself states, the F.B.I. and Windsor police jointly investigated the bank robbery.[15] Furthermore, the state arrest warrant was executed jointly by state and federal officers and the F.B.I. assisted in transporting the defendant to the Hartford police station. Finally, the F.B.I. conducted the interrogation of the defendant while he was in custody at the Hartford police station. All of this indicates that the state detention may well have served as a "holding action" while the federal prosecutor prepared to present his case to the grand jury and for the subsequent trial. However, while there is merit to the defendant's claim that the 90-day period should include the time spent in state custody, I need not decide that issue at this time, for even as so calculated the 90-day period has not yet expired.

Title 18, U.S.C. § 3161 establishes the time limits within which various stages of the criminal process must be completed. For example, § 3161(g) requires that a trial take place within 180 days of arraignment. These provisions are designed to insure the speedy trial and disposition of federal criminal cases. However, recognizing that certain delays are justifiable, 18 U.S.C. § 3161(h) delineates the categories of delay which are excludable time for purposes of computing the various time limits of § 3161. Thus, 18 U.S.C. § 3161(h)(1) excludes delay resulting from hearings on pre-trial motions and 18 U.S.C. § 3161(h)(1)(G) excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement."

Title 18, U.S.C. § 3164 is directed to a slightly different aspect of the speedy trial problem. It seeks to prevent a defendant from remaining in custody for an extended period of time while awaiting a trial. Section 3164(b) places the limit at 90 days, beyond which the defendant must be released from custody pending trial. However, § 3164(c) recognizes that if failure to commence trial is through the fault of the accused or his counsel, the 90-day limit may be extended.

The question presented here is whether the categories of excludable time outlined in 18 U.S.C. § 3161(h) are also applicable to the computation of the 90-day detention limit of 18 U.S.C. § 3164. This issue has not been resolved finally by the Second Circuit. However, in *United States v. Martinez*, 538 F.2d 921 (2d Cir. 1976), aff'g *United States v. Mejias*, 417 F.Supp. 579 (S.D.N.Y.1976), the court had before it a decision of Judge Carter of the Southern District of New York which found the § 3161(h) exceptions applicable to § 3164's time period. *United States v. Mejias, supra*, 417 F.Supp. at 582–84. While the Second Circuit panel articulated an independent basis for affirming Judge Carter's decision, it found his analysis of the present problem "quite persuasive." *United States v. Martinez, supra* at 924. I also find that analysis persuasive and, thus, I hold that the excludable time provisions of § 3161(h) apply to the computation of the 90-day period of § 3164.

The present motions to suppress were filed on October 8, 1976. The mere filing of motions does not toll the 90-day period. Hearings on these motions were calendared for October 18, 1976; but at the request of defense counsel and for good cause, the hearings were postponed until November 2, 1976. Because this delay stemmed from a request of defense counsel, this period is excludable under § 3164(c). Hearings were held on the motions to suppress on November 2, 1976 and November 4, 1976. A hearing was held on November 12, 1976, to hear evidence on this motion for release. These actual hearing days are excluded by § 3161(h)(1)(E). I took the motions to suppress under advisement on November 4, 1976. Thus, the 30-day period immediately following November 4, is excluded by § 3161(h)(1)(G). Consequently,

---

**15.** Defendant's Exhibit 5, Overstrom affidavit ¶ 3.

the 90-day period has been tolled since October 18, 1976. As a result, even if the 90-day period began to run on July 30, 1976, as the defendant asserts, it has not yet expired. For this reason, I deny defendant's motion for release from custody.

### III. *Motion to Suppress*

The defendant made three different incriminating statements while he was in custody at the Hartford police station. He is now seeking to suppress these statements. Lewis makes two arguments in support of his motion to suppress. First, he argues that his arrest was illegal and that the statements are the fruit of that illegality and hence inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Secondly, he argues that these statements were procured in violation of his constitutional rights because they were given involuntarily and in violation of the procedures established in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The remainder of this opinion analyzes these claims.

### A. *Legality of Arrest*

Lewis was arrested pursuant to a state arrest warrant. The warrant was issued on the basis of an affidavit sworn by Windsor police detective Overstrom. The defendant argues that this affidavit, on its face, is insufficient to establish probable cause. Alternatively, Lewis contends that "intentional and material omissions" from the affidavit render it insufficient to support the arrest warrant. Ultimately, the claim is that the three statements were the product of an illegal arrest and, therefore, are inadmissible.

#### 1. *The Facial Validity of the Affidavit*

In his affidavit, Detective Overstrom states that the bank was robbed on July 10, 1976, by two black males. He then states that joint investigation by the Windsor police and the F.B.I. led to the arrest of Wayne Brown. The next paragraph states that "a confidential informer, a known associate of Wayne Brown,"[16] was told by Wayne Brown that he had robbed the bank. The informant also said that the other robber was named "Arlo." The affidavit then says that further investigation revealed that the "Arlo" referred to was Arlo Lewis. The affidavit states that Lewis fit the police's general description of the second robber and that he was a known associate of Wayne Brown. The final paragraph of the affidavit reveals that Overstrom and F.B.I. Agent Willis showed a spread of photographs to Joseph R. Luppachino, Jr., the bank manager, who was present during the robbery and that he identified a photograph of Arlo Lewis as being one of the robbers.

The defendant's claim that this affidavit does not establish probable cause is without merit. "In dealing with probable cause . . . ., as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Reading the affidavit in a "commonsense way rather than technically," it states ample information to establish probable cause. *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■ The affidavit does rely in part upon the hearsay statements of an unnamed informant. While this information standing alone might not be sufficient to establish probable cause under the standards of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the affidavit provides sufficient corroborating information to support its reliability. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In addition to learning that the "Arlo" referred to by the informant was Arlo Lewis, the police ascertained that he fit the general description of the second bank robber. More importantly, the officer stated that bank manager Luppachino identified the photograph of Lewis as

---

**16.** Defendant's Exhibit 5, Overstrom affidavit ¶ 4.

one of the robbers. Indeed, this identification by a witness to the crime may in and of itself be sufficient to establish probable cause. *United States v. Smith,* 467 F.2d 283 (9th Cir. 1972) (per curiam), *cert. denied,* 410 U.S. 912, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973). Therefore, the defendant's challenge to the facial validity of the affidavit fails.

### 2. Omissions from the Affidavit

Prior to obtaining a state warrant to arrest the defendant, Windsor police detective Overstrom displayed a spread of seven photographs, one of which was of Arlo Lewis, to two employees of the bank and three customers of the bank, all of whom were in the bank at the time of the robbery. In addition, Detective Overstrom showed the photographic spread to two other persons who saw two black males in the vicinity of the bank at relevant times. Of these seven persons, only the bank manager was able to make an identification; he identified the photograph of Arlo Lewis. Detective Overstrom included in his affidavit the fact that Luppachino had made an identification of Arlo Lewis. However, he failed to include that six other persons had been unable to make an identification. The defendant argues that this omission requires a finding that the affidavit and hence the arrest warrant were fatally defective.

█ In recent years, federal courts have permitted a defendant to delve below the surface of a facially sufficient supporting affidavit to test its accuracy.[17] *See, e. g., United States v. Carmichael,* 489 F.2d 983 (7th Cir. 1973) (*en banc*). *See generally,* Kipperman, *Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evi-*dence, 84 Harv.L.Rev. 825 (1971). In most instances, the claim has been that the supporting affidavit contained a misrepresentation of fact. In those cases, the courts have established two general criteria for assessing the effect of a misrepresentation on the ensuing arrest or search. The first criterion looks to the culpability of the affiant. The inquiry is whether the misrepresentation resulted from a purposeful intent to deceive the issuing judicial officer or was merely an innocent or negligent mistake. The second criterion tests whether the misrepresentation was material to a finding of probable cause. The Second Circuit has held that the warrant is defective if the misrepresentation is either material or was purposefully intended to deceive the issuing judicial officer. *United States v. Pond,* 523 F.2d 210, 213 (2d Cir. 1975), *cert. denied,* 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976); *United States v. Gonzalez,* 488 F.2d 833, 837 (2d Cir. 1973). *Accord, United States v. Thomas,* 489 F.2d 664, 669 (5th Cir. 1974); *United States v. Marihart,* 492 F.2d 897 (8th Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974). While the present concern is with an omission from an affidavit rather than the inclusion of a misrepresentation, I find the same criteria are applicable. *Morris v. Superior Court,* 57 Cal.App.3d 521, 129 Cal.Rptr. 238 (1976).

█ Detective Overstrom "did not intend to deceive or mislead the Judge to whom the affidavit was addressed, or anyone else, [rather] he consciously failed to include this information because he did not feel it was relevant."[18] Thus, Detective Overstrom was at most negligent in failing to include in his affidavit the inability of others to make an identification.[19] For this reason,

---

**17.** Because the defendant and the Government entered into a stipulation, there is no need to decide whether the defendant's assertions *would be sufficient to require an evidentiary* hearing. *See, United States v. Carmichael,* 489 F.2d 983, 988 (7th Cir. 1973) (*en banc*).

**18.** Defendant's Exhibit 8, Overstrom affidavit ¶ 8.

**19.** In assessing the propriety of Overstrom's conduct, it is important to keep the following in mind:

"That the strengths and weaknesses of the government's case were not all set forth in the affidavits does not appear to be reason [enough] to invalidate the search warrants. If this were the case, most affidavits would be lengthy briefs, carefully arguing the infer-

there is no basis for finding the affidavit defective on the grounds of the culpability of the affiant. *United States v. Pond, supra,* 523 F.2d at 214; *United States v. Gonzalez, supra,* 488 F.2d at 838.

The remaining question is whether the omitted information was material to the finding of probable cause. In cases dealing with the inclusion of misrepresentations in the affidavit, the courts have tested the materiality of the inaccuracy by ascertaining whether probable cause exists with the erroneous statement deleted. *United States v. Gonzalez, supra,* 488 F.2d at 838. Therefore, the appropriate test here is whether the addition to the affidavit of the omitted material vitiates the finding of probable cause. *Morris v. Superior Court, supra* at 241. I find that it does not.

There is no doubt that the identification of bank manager Luppachino was an important element in establishing probable cause for the arrest of Arlo Lewis. Furthermore, the failure of other eyewitnesses to make an identification from the same photographic spread is relevant to the accuracy of that identification and would be admissible at trial. Nevertheless, the omitted information does not sufficiently diminish the force of Luppachino's identification to negate probable cause.

As noted above, the significant weight to be given to an eyewitness identification is revealed by the fact that a single identification by an eyewitness may in and of itself support a finding of probable cause. For example, in *United States v. Smith, supra,* the Ninth Circuit affirmed a finding of probable cause solely upon the basis of a bank manager's photographic identification of a robber. In the present case, the identification is supplemented by other evidence and there is no challenge to the bank manager's credibility. Also, the other persons did not make a contrary identification. They were merely unable to make an identification. Finally, it must be emphasized that the concern here is with probable cause not with proof beyond a reasonable doubt. As Judge Judd stated in *United States v.* ences to be drawn from every fact presented."

*Averell,* 296 F.Supp. 1004, 1018 (E.D.N.Y. 1969), when confronted with a similar omission from an affidavit in support of a search warrant:

"In evaluating the [materiality of omitted] facts it is important to be mindful of the difference between the probable cause necessary to support a[n] [arrest] warrant and the strict proof necessary to support a jury verdict."

*Accord, Spinelli v. United States, supra,* 393 U.S. at 419, 89 S.Ct. 584. With this distinction in mind, I find the omitted information does not render the supporting affidavit and the arrest warrant defective.

The arrest of Arlo Lewis was supported by probable cause and hence was consistent with the requirements of the fourth and fourteenth amendments. Therefore, defendant's effort to suppress the three statements as fruits of an illegal arrest is rejected.

B. *Voluntariness of the Statements*

The defendant made three incriminating statements on Saturday, July 17, 1976, the day of his arrest. The first one occurred on Saturday morning at the Hartford police station when he indicated that he had last seen Wayne Brown, his alleged accomplice, on the day of the robbery. The second statement was made to Detective Campbell in the "lockup" area late Saturday afternoon. The third statement was the written confession given to Agent Miller on Saturday evening.

■■■ Lewis argues that each of these statements must be suppressed because they were involuntary. The defendant asserts two interrelated bases for this claim. The first is that each statement was procured in violation of the procedures outlined in *Miranda v. Arizona, supra.* The second basis is that apart from *Miranda* the statements were involuntary because the defendant's physical condition precluded him from making a knowing and intelligent waiver of his constitutional rights.

*United States v. Averell,* 296 F.Supp. 1004, 1018 (E.D.N.Y.1969).

In *Miranda v. Arizona,* the Court held that:

"a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

384 U.S. at 475, 86 S.Ct. at 1628. Leaving *Miranda* to one side, it is now settled that a confession which is challenged on constitutional grounds is admissible if the court is satisfied by a preponderance of the evidence that the legal requirements for admission have been met. It is not necessary to establish the admissibility beyond a reasonable doubt. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. Wedra,* 343 F.Supp. 1183, 1185 (S.D.N.Y.1972). In assessing whether this burden has been met, the court must consider the "totality of the circumstances," *Schneckloth v. Bustamonte,* 412 U.S. 218, 223–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), including the "experience and conduct of the accused as well as the credibility of the police officer'(s) testimony." *Pettyjohn v. United States,* 136 U.S.App.D.C. 69, 419 F.2d 651, 654 n. 7, *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1969). With these principles in mind, I now consider the defendant's claims with respect to each of these statements.

1. *Statement to Agent Willis on Saturday Morning*

The record reveals that at the time of his arrest at his Hartford apartment on Saturday morning July 17, Arlo Lewis was twice given *Miranda* warnings.[20] He made no statement in response to those warnings. The defendant was then taken to the Hartford police station where the warnings were again given at 9:41 a. m. At 9:44 a. m., Lewis signed an "Interrogation and Advice of Rights Form," acknowledging that he understood the warnings. There is no dispute that in response to those warnings Lewis said that he "didn't want to say anything until [he] saw a lawyer."[21] After that statement, Special Agent Willis asked him when he had last seen Wayne Brown, his alleged accomplice. In response to that question, Lewis said that he had seen him on the day of the robbery.[22] The defendant seeks to suppress this statement.

The statement concerning Wayne Brown was made in response to Special Agent Willis' question and after Lewis stated that he wanted to consult with an attorney. While it is an open question whether an accused who indicates a desire to consult with counsel can later change his mind following new warnings, *see infra* Part II B 3, it is certain that interrogation cannot continue at the time he first makes the statement. *Miranda v. Arizona, supra* 384 U.S. at 474, 86 S.Ct. 1602; *cf. United States v. Collins,* 462 F.2d 792, 801–02 (2d Cir. 1972) (*en banc*). Therefore, the defendant's statement concerning Wayne Brown was procured in violation of *Miranda's* procedures and must be suppressed.

2. *Statements made to Detective Campbell on Saturday Afternoon*

At approximately 5:30 p. m. on Saturday July 17, Hartford police detective Edgar Campbell and the defendant Arlo Lewis had a conversation in the "lockup" of the Hartford police station. During the course of that conversation, Lewis admitted his participation in the Windsor bank robbery. The defendant seeks to suppress these statements claiming they were the product of custodial interrogation and procured in violation of *Miranda* because no warnings were given. The Government counters that they were spontaneously volunteered by the defendant and hence not subject to the requirements of *Miranda.*

**20.** Transcript at 140, 219–220.

**21.** Transcript at 72, 141.

**22.** There is conflicting testimony as to whether this question was asked and answered before or after Lewis indicated that he wished to speak to counsel. However, the conflict is in the statements of two F.B.I. agents. Transcript at 152, 223. Therefore, I must conclude that the Government has not met its burden in this regard.

I have heard two versions of what happened during the course of the conversation between Lewis and Campbell. Based on all the testimony and my assessment of the circumstances surrounding the conversation, I believe the following relevant facts occurred. Lewis initiated the conversation by asking Campbell to give a message to his girlfriend. Campbell then asked the defendant what he was doing in the "lockup." Lewis responded that he had been arrested for the Windsor bank robbery. Before Lewis made any incriminating statements, Campbell, who was not investigating the Windsor bank robbery (being a Hartford police officer), said that he had seen "a beautiful photograph of the hold-up" and that Windsor police officers had shown him a picture of Lewis and said they wanted him for the robbery.[23] He also encouraged Lewis to cooperate with the F.B.I. The defendant then confessed to his participation in the robbery. Campbell took no notes of the conversation. He, at no time, gave the defendant *Miranda* warnings.

■ The *Miranda* requirements are triggered by "custodial interrogation." The defendant was in custody at the time of this conversation. *Cf. Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Thus, the only question here is whether the statements were given in response to interrogation by Detective Campbell. In *Miranda,* the Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612. However, because interrogation is not always pre-arranged or planned, and officers use a variety of techniques to elicit information, the content of "interrogation" must be defined on a case-by-case basis. *United States v. Charles,* 371 F.Supp. 204, 208 (E.D.N.Y.1973), *aff'd,* 490 F.2d 1406 (2d Cir. 1974). In this regard, a useful standard is whether the police conduct was "expected to, or likely to, evoke

admissions." *Santos v. Bayley,* 400 F.Supp. 784, 795 (M.D.Pa.1975), *quoting Commonwealth v. Simala,* 434 Pa. 219, 226, 252 A.2d 575 (1969). *Cf. United States v. Vasquez,* 476 F.2d 730 (5th Cir.), *cert. denied,* 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973). Applying that test here, I find that Lewis' statements to Campbell were the product of interrogation.

■ The Government emphasizes that Lewis initiated the conversation with Campbell. However, by initiating a conversation unrelated to the crime itself, an accused does not open the door for a discussion about his participation in the crime. Lewis merely asked Campbell to do a favor for him. It was Campbell who directed the conversation to the subject of the bank robbery by asking what Lewis was doing in the "lockup." Furthermore, as detailed below, he prodded Lewis' statements with additional remarks concerning the robbery. *Cf. Santos v. Bayley, supra,* 400 F.Supp. at 795. Thus, this is not a case where an accused spontaneously volunteers incriminating information as in *United States v. Gaynor,* 472 F.2d 899 (2d Cir. 1973) (per curiam). *See also, United States v. Nussen,* 531 F.2d 15, 21 (2d Cir. 1976).

■ In asserting that there was no interrogation, the Government also stresses that Campbell, a Hartford police officer, was not investigating the Windsor bank robbery, as evidenced by the fact that he did not take notes of the conversation. However, he was aware of the robbery. Indeed, he told Lewis that he had seen a "beautiful photograph of the hold-up" and that he was shown a picture of Lewis by the Windsor police who told him that they wanted Lewis for the robbery. In addition, Campbell encouraged Lewis to cooperate with the authorities. While his conduct was not particularly overbearing, Campbell's remarks were likely to, and did in fact, evoke incriminating statements from Lewis.[24] Therefore, I find that Lewis' ad-

---

**23.** Transcript at 199.

**24.** This is not a case where the questioning was unrelated to the crime, nor was it merely an effort to procure basic biographical information

missions to Campbell were the product of interrogation and that the requirements of *Miranda* were applicable. After the earlier warnings, Lewis had stated that he wanted to consult with counsel and had chosen to remain silent. Thus, Campbell could not interrogate him without at the very least giving renewed warnings. *Collins v. United States, supra.* Campbell did not give these warnings, and hence these statements must be suppressed.

### 3. Statements made to Special Agent Miller on Saturday Evening

At the conclusion of the conversation with Detective Campbell, Lewis asked him to contact Special Agent Willis. Campbell was reluctant to contact the agent at his home on a Saturday night. However, after Lewis assured Campbell that he was sincere in his desire to speak to the F.B.I., Campbell contacted the Windsor police. They in turn contacted Special Agent Miller (not being able to contact Willis), and he arrived at the Hartford police station at 8:20 p. m. Upon his arrival, Special Agent Miller advised Lewis of his rights. At 8:30 p. m., Lewis signed an "Interrogation Advice of Rights Form," acknowledging that he understood his rights.[25] During that 10-minute period, Special Agent Miller discussed those rights with Lewis. In view of the defendant's earlier desire to consult with counsel, Miller wanted to assure himself that "Lewis realized exactly what he was doing." [26] Miller also noticed a hospital identification tag on Lewis' wrist, and thus inquired as to his physical condition. Based upon these inquiries, Special Agent Miller was satisfied that the defendant was in full possession of his faculties.

Following this inquiry and Lewis' execution of the form, Miller questioned him about the robbery. The defendant confessed to his participation in the crime. His

confession was transcribed, and Lewis signed a written statement at 10:05 p. m. The defendant now seeks to suppress these statements, claiming that they were procured in violation of his rights.

In determining the admissibility of these statements, the initial question is whether Lewis' earlier desire to consult with counsel before speaking with the F.B.I. precludes a waiver of that right at a later time. In *Miranda v. Arizona,* the Court stated:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at anytime prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

384 U.S. at 473–74, 86 S.Ct. at 1627. Since *Miranda,* courts have struggled with whether these remarks were intended to create a per se rule preventing renewed interrogation after an accused's assertion of his right to remain silent or to consult with counsel. *See e. g., United States v. Collins, supra.* The defendant argues for such a per se rule with respect to the assertion of a desire to consult with counsel. However, the notion that an accused's earlier asserted right to remain silent may never be waived was rejected in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

In *Michigan v. Mosley,* the Court considered the propriety of renewed interrogation after an accused has indicated a desire to remain silent. The Court held that *Miranda* did not create a per se rule and, therefore, that an accused could change his mind and waive his initially asserted right to remain silent. In *Mosley,* the Court did not consider whether a similar possibility for waiver exists after an accused has once

from the defendant. *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109 (2d Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). Detective Campbell's conduct was similar to a technique of interrogation described in *Miranda v. Arizona,* 384 U.S. 436, 450, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**25.** Government's Exhibit D.

**26.** Transcript at 227.

indicated a desire to consult with counsel; [27] but the Court's rationale is instructive. In rejecting a literal reading of the above-quoted passage in *Miranda,* the Court stated:

"[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests."

423 U.S. at 102, 96 S.Ct. at 325. This argument against a per se rule is equally applicable in the present context.

While I reject a per se rule, I do recognize that there are differences between an accused's assertion of a right to remain silent and an assertion of a desire to consult with counsel. An indication of a desire to consult with counsel does reveal that the accused feels somewhat incompetent to deal with the police without prior legal advice. However, this fact does not require a per se preclusion of renewed interrogation, but rather necessitates a more careful scrutiny of the individual's later choice to waive his rights and speak to the authorities.[28] This approach has been adopted by other courts, *see, e. g., United States v. Cavallino,* 498 F.2d 1200, 1202–03 (5th Cir. 1974), and is, I believe, wholly consistent with the primary goal of *Miran-*

da to insure that waivers of constitutional rights are made "voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. 1602.

The remaining question, therefore, is whether the defendant's decision to give a statement to Special Agent Miller was made "voluntarily, knowingly, and intelligently." *Cf. United States v. Satterfield,* Docket No. 76–1372 (2d Cir. 1976) (waiver of sixth amendment rights *after indictment*). The defendant claims that his decision was tainted by the fact that he let the "cat out of the bag" by confessing to Detective Campbell, following illegal interrogation. However, the Second Circuit has recently held that "let[ting] the cat out of the bag" during illegal interrogation does not require an automatic finding of involuntariness with respect to later statements. *Tanner v. Vincent,* 541 F.2d 932, 936–37 (2d Cir. 1976). It is at most one factor in assessing voluntariness. *Cf. United States ex rel. Stephen J. B. v. Shelly,* 430 F.2d 215 (2d Cir. 1970). In the present case this factor is outweighed by other factors which indicate to me that Lewis' decision to speak to Miller was voluntary.[29] *Cf. United States v. Bayer,* 331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); *Tanner v. Vincent, supra.*

At the conclusion of his conversation with Campbell, Lewis asked to speak to the F.B.I. Indeed, when Detective Campbell indicated reluctance to contact the agent on a Saturday night, Lewis per-

---

**27.** I should note that the defendant's position derives support from a statement of Justice White in his concurring opinion in *Michigan v. Mosley,* 423 U.S. 96, 107, 109–110, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), where he suggests that the *Miranda* Court did believe that an accused who initially indicates a desire for counsel could not later waive that right. A divided panel of the Ninth Circuit recently relied upon this statement in holding that *Miranda* created a per se rule. *United States v. Flores-Calvillo,* Docket No. 75–3785 (July 14, 1976) *pending petition for rehearing en banc.* However, in light of the majority's opinion in *Mosley,* I disagree.

**28.** In a footnote in *Michigan v. Mosley,* Justice White makes a similar point:

"[T]he accused having expressed his own view that he is not competent to deal with

the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." 423 U.S. at 110 n. 2, 96 S.Ct. at 329.

**29.** I accord little weight to the fact that Lewis had already confessed to Campbell. I do not believe Lewis' statements to Miller were motivated or caused by the earlier confession. Lewis' testimony to this effect is, in my opinion, an afterthought and not credible. Transcript at 90. My belief is that he chose to speak to Miller because he felt it was in his best interest to do so. His confession to Miller, therefore, was not tainted by anything that occurred during his conversation with Campbell.

suaded him to do so.[30] Two hours passed before Special Agent Miller arrived. This was sufficient time for Lewis to reconsider his decision to talk. Furthermore, and most importantly, Lewis confessed only after he was fully informed of his rights for the fourth time that day. He was then entirely free to evaluate the situation and consider whether he wanted to talk. Indeed, Special Agent Miller, aware that Lewis had earlier wanted to consult with counsel, took special care in advising him of his rights in order to assure himself that the defendant "knew exactly what he was doing." Special Agent Miller also inquired about the defendant's physical condition. Based upon that inquiry, he became convinced that Lewis was in full possession of his faculties. I also find that the defendant's physical condition did not impede his judgment.[31] Fully cognizant of the special scrutiny that must be paid to Lewis' decision to change his mind and the "heavy burden" which rests upon the Government, I find that the defendant's decision was made "voluntarily, knowingly and intelligently." *Cf. United States v. Duvall,* 537 F.2d 15 (2d Cir. 1976).[32] As such, the oral and written confessions given to Special Agent Miller are fully admissible.

### IV. *Conclusion*

Defendant's motion for release from custody pending trial pursuant to 18 U.S.C. § 3164 of the Speedy Trial Act and Section 10(a) of the Speedy Trial Plan for the District of Connecticut is denied. Defendant's motion to suppress statements he made while he was in custody is granted in part and denied in part. The statement made to Special Agent Willis and the statements to Detective Campbell are inadmissible because they were elicited in violation of the procedures outlined in *Miranda v. Arizona, supra.* The oral and written confession given to Special Agent Miller is fully admissible.

It is SO ORDERED.

---

30. This point should not be overemphasized. Campbell did encourage Lewis to cooperate with the authorities. Nevertheless, his insistence on speaking to the F.B.I. on Saturday night reflects in my mind the voluntariness of his actions.

31. The defendant made no medical requests of any of the officers to whom he spoke during the day. He had been treated in the afternoon at the Hartford Hospital for a small knife wound. At that time he did not complain of narcotics withdrawal. Transcript at 116–17. Finally, he had been treated by the Hartford police's doctor a half-hour before he spoke to Agent Miller and the doctor did not find that he was suffering from an advanced stage of withdrawal. In any event, he had been treated before he spoke to Special Agent Miller. The defendant's expert testified that this treatment would provide comfort within a short period of time. Transcript at 260. Thus, the defendant's claim that his judgment was impaired is not supported by the evidence. Nor does the record support his claim that he confessed in return for a promise of medical treatment.

32. The defendant has also challenged the admissibility of the confession under 18 U.S.C. § 3501. My assessment of the factors outlined in § 3501(b) leads to the conclusion that the confession is admissible under that statute. *United States v. Barry,* 518 F.2d 342 (2d Cir. 1975).