Burley Clifton HARRYMAN,
Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas
Department of Corrections,
Respondent-Appellee.

No. 78–2459.

United States Court of Appeals,
Fifth Circuit.

May 9, 1980.

Michael Anthony Maness, Houston, Tex., for petitioner-appellant.

Douglas M. Becker, Randy E. Drewett, Barbara M. Barron, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.[*]

FRANK M. JOHNSON, Jr., Circuit Judge:

This is an appeal from the denial of a motion filed pursuant to 28 U.S.C. § 2254 for habeas corpus relief from a conviction and sentence imposed upon Burley Clifton Harryman by the Texas state courts.

In January, 1973, a Texas jury convicted Harryman of unlawful possession of heroin and assessed punishment at confinement for life in a Texas penitentiary.[1] Harryman was sentenced accordingly,[2] and the

---

[*] Judge Charles Clark chose not to participate in the consideration of this case.

1. The jury found Harryman guilty of violating the Uniform Narcotic Drug Act, Tex.Penal Code art. 725b, which made it unlawful, except in certain limited circumstances, id. § 2A, for any person to "manufacture, possess, have, control, sell, prescribe, administer, dispense, compound, offer to sell, or offer to buy any narcotic drug." Id. § 2A. The finding subjected Harryman, as a first offender, to punishment "by imprisonment in the state penitentiary for not less than two years nor more than life."

Id. § 23(a). Pursuant to Tex.Code Crim.Proc. Ann. art. 37.07, Harryman elected to have the jury rather than the judge fix punishment. After a hearing at which the state, in accordance with Texas rules of criminal procedure, introduced evidence of Harryman's substantial prior criminal record, the jury assessed punishment at the maximum allowed by law.

2. Pursuant to Texas' indeterminate sentence statute, Tex.Code Crim.Proc. art. 42.09, the judge pronounced a sentence of not less than

conviction and sentence were affirmed on appeal. *Harryman v. State*, 522 S.W.2d 512 (Tex.Cr.App.1975).

■ In June, 1976, Harryman applied to the United States District Court for the Northern District of Texas for a writ of habeas corpus. He contended, as he had in state court, that the introduction into evidence of an incriminating statement made by him after his arrest but before he was given any of the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), violated his constitutional rights.[3] After argument, the district court accepted the findings and recommendations of a magistrate and concluded that although admission of the statement had been an error of constitutional dimensions, it had been harmless. The district court denied the writ. A panel of this Court reversed that determination and ordered that the writ be issued. *Harryman v. Estelle*, 597 F.2d 927 (5th Cir. 1979). The panel opinion was automatically vacated when we granted a rehearing *en banc*. *Harryman v. Estelle*, 602 F.2d 1244 (5th Cir. 1979). See 5th Cir. R. 17.

The facts are as follows. On August 25, 1972, Harryman registered at a Dallas, Texas, motel. On the evening of September 7, 1972, with Harryman several days behind in his rent, with the motel nearing capacity, and with efforts to reach Harryman having

proved futile, an assistant manager of the motel named Sandra Wood entered Harryman's room to remove his belongings. In addition to finding traditional personal belongings such as clothing, she discovered a high-powered rifle with a telescopic sight and a variety of apparent narcotics paraphernalia, including at least two spoons that had been burned on the bottom and a number of syringes. She removed everything to a utility closet and called the police.

Two patrolmen responded. One, accompanied by two narcotics officers called in to assist, searched Harryman's room with no result. The other examined the removed belongings. A radio check revealed that the rifle had been reported stolen in Colorado. A radio check also revealed that the license plates on the car with which Harryman had registered into the motel had apparently been stolen. The officers explained to Wood what they had found, told her that they thought it unlikely that Harryman would return, but asked her to call the police station if he did. They then confiscated everything that had been taken from Harryman's room and departed.

About eight hours later, at approximately 4:30 a. m., Harryman did return and Wood again called the police. While Harryman was in the lobby paying his bill and attempting to retrieve his belongings, two

two years, the minimum term allowed under the Act, and not more than life, the punishment assessed by the jury.

3. The Texas Court of Criminal Appeals rejected this contention on the ground that the statement was, in any event, properly admissible under Tex.Code Crim.Proc. art. 38.22, § 1(f), as "res gestae of the arrest." *Harryman v. State*, 522 S.W.2d at 516–17. We decline the state's invitation, not made to the district court, that we extend the doctrine of *Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976) ("where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial"), to *Miranda* violations; find this state proceeding to have been "full and fair"; and refuse to consider Harryman's claim. The Supreme

Court recently had an opportunity, procedurally similar to this one, to so extend *Stone* to *Miranda* violations but did not do so. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977); *id.* at 413–14, 97 S.Ct. at 1246–47 (Powell, J., concurring).

Harryman also claimed in state court that his statement should not have been admitted because it was obtained as a result of a warrantless arrest that he alleged was not based on probable cause. As the Texas Court of Criminal Appeals found, this claim was without merit. Although the police officers did not have a warrant, the facts plainly establish not only that they did have probable cause, but that there were also exigent circumstances. *See Harryman v. State*, 522 S.W.2d at 513–16. *See generally Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Harryman does not raise the claim here. *See Stone v. Powell, supra.*

different patrolmen arrived. While Wood explained to one what the other officers had found earlier, the other asked Harryman, at Wood's request, to step outside and calm down. Harryman conceded in his state court appeal that he did so voluntarily. The two officers then placed Harryman under arrest. One of the officers searched his person and found concealed at the base of his back, tucked under the waist band of his trousers, a condom containing a white powdered substance. Before reciting the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the officer asked, "What is this?" Harryman responded, "Oh, you know what it is. It is heroin."

Following an evidentiary hearing, the trial court denied Harryman's motion to suppress the statement. The arresting officers testified to the statement at trial as part of the state's case in chief, and it was adverted to by the prosecution in closing argument.

## I.

The core of the Supreme Court's holding in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was that:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Id.* at 444, 86 S.Ct. at 1612 (footnote omitted).

■ It seems plain that *Miranda,* was violated here. It is uncontested that a police officer asked Harryman a question, that Harryman made a direct response, that Harryman was in custody at the time and that he had not yet received a recitation of his rights. The prosecution used the response at trial as part of its case in chief.

The basis of the state's contention that *Miranda* was not violated is its claim that Harryman was not subjected to the kind of police questioning that the Supreme Court in *Miranda* sought to control. It argues that the question asked Harryman was not an attempt to elicit an answer of any sort, much less evidence of a crime, but was rather an exclamation of surprise.

This argument misunderstands *Miranda.* Prior to *Miranda,* the Supreme Court attempted to protect an accused from improper police questioning by holding inadmissible statements that appeared to have been involuntary in light of the totality of their surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Spano v. New York,* 360 U.S. 315, 321 n. 2, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265 (1959) (citing 28 cases). Were we to follow such an approach here, we might well find that Harryman's statement was voluntary and therefore properly admitted.

But in *Miranda,* the Court found the totality of the circumstances approach inadequate. Recognizing that in-custody questioning has inherently coercive tendencies, the Court adopted in its place a set of rigid procedural rules. It held that until these rules have been followed, and an accused has been adequately informed of and waived his rights, he may not be questioned. If he is questioned, any statements he makes in response cannot be presented by the prosecution as part of its proof at trial. 384 U.S. at 444–91, 86 S.Ct. at 1612–36. *See Michigan v. Tucker,* 417 U.S. 433, 443–44, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974).

■ The rigidity of the *Miranda* rules and the way in which they are to be applied was conceived of and continues to be recognized as the decision's greatest strength. *E. g., Tague v. Louisiana,* —— U.S. ——, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980); *Miranda v. Arizona,* 384 U.S. at 479, 86 S.Ct. at 1630. *See also Fare v. Michael C.,* 439 U.S. 1310, 1314, 99 S.Ct. 3, 5, 58 L.Ed.2d 19

(1978) (Rehnquist, J., on application for stay) (calling rigidity of *Miranda* its "core virtue"). The decision's rigidity has afforded police clear guidance on the acceptable manner of questioning an accused. It has allowed courts to avoid the intractable factual determinations that the former totality of the circumstances approach often entailed. When a law enforcement officer asks a question of an accused and the accused, without the benefit of *Miranda's* safeguards, answers, the totality of the circumstances is irrelevant. The accused's answer is simply inadmissible at trial as part of the prosecution's case in chief.

The state's suggestion that we abandon *Miranda's* rigidity here and temper its prohibition of all unsafeguarded police questioning must be declined. It is not for us to redefine *Miranda's* scope. *See, e. g., Fare v. Michael C.,* 439 U.S. at 1314, 99 S.Ct. at 5.

■ Under *Miranda*, courts have no reason or mandate to consider whether, as the state suggests here, a law enforcement officer's question was not really a question because, objectively considered, it did not call for a response.[4] As this case itself illustrates, this would entail just the kind of

difficult and often impossible factual inquiry that the *Miranda* rules purposely preempt.[5] For purposes of *Miranda*, and the accused's Fifth Amendment right not to be compelled to incriminate himself, it is enough to decide that what the officer said could reasonably have had the force of a question on the accused.[6] That this was the case here is apparent from the fact that, and the way in which, Harryman responded.

■ Under *Miranda*, courts also have no reason or mandate to consider whether or not a police question was asked in an attempt to elicit evidence of a crime.[7] Here again the factual difficulties inherent in such an inquiry are of the very sort the Supreme Court in *Miranda* thought essential to avoid.[8] Where a state has alleged that there was a sufficiently compelling noninvestigatory purpose for asking questions of an accused who had not been informed of or waived his rights, we have bent *Miranda*, considered the factual basis of the allegation, and, where we have found it to be adequately supported, allowed any statements made in response to the ques-

---

4. The state argues that the question asked Harryman was "a question in form only in the sense that it was uttered in general wonderment," that it therefore did not call for an answer, and thus that Harryman's response should be considered independently from the question as a statement that he simply "volunteered." *See Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1629. ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.")

The state does not contend, nor does it appear, that Harryman's statement was unresponsive to the officer's question and thus volunteered within the meaning of our decision in *United States v. Menichino,* 497 F.2d 935, 941 (5th Cir. 1974) (holding admissible statements volunteered by accused during booking process but not in response to officer-initiated inquiries). *See also United States v. La Monica,* 472 F.2d 580, 581 (9th Cir. 1972).

5. The state admits that "the record is silent as to the tone of voice or loudness of the question and other such circumstances." It argues simply that "it seems not unlikely" that the question asked Harryman was not really a question.

6. *Cf. United States v. Jordan,* 557 F.2d 1081, 1085 (5th Cir. 1977) (police may not circumvent *Miranda* requirement by using 'technique' of posing question in declaratory form). *See also Stanley v. Wainwright,* 604 F.2d 379, 382 (5th Cir. 1979).

7. The officer who searched Harryman and who asked him the question at issue testified at trial that he knew that Harryman was arrested on suspicion of burglary or theft. The state argues from this testimony that the officer knew only that Harryman was suspected of burglary or theft, that he did not expect to find such "a bizarre physical item" as a condom filled with white powder in Harryman's trousers, and thus that his question was a reflexive action asked "only out of the desire to ascertain the identity of an object as to which he had no prior or immediate knowledge of its contents."

8. The state admits that the determination of whether or not a question was asked in an attempt to elicit evidence of a crime is "no easy task and involves consideration of the totality of the circumstances insofar as the interaction between the police officer and the accused is concerned." *See also* note 5, *supra*; note 11, *infra*.

tions to be used by the prosecution at trial. See, e. g., *United States v. Castellana*, 500 F.2d 325, 326–27 (5th Cir. 1974) (en banc) (question as to presence of firearms justified by personal safety concerns of arresting officers); *United States ex rel. Hines v. La Vallee*, 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976) (routine questions as to name, address, marital status, etc., justified by immediate need for booking and arraignment information).[9] Here the state does not allege, nor does the record indicate, any, much less any compelling, non-investigative purpose for the question asked Harryman. The state alleges only that the question was asked out of shock and surprise.[10] Such will not justify a departure from *Miranda*.[11]

The district court was correct in concluding that the prosecution's use of Harryman's statement at trial violated *Miranda* and constituted constitutional error.

## II.

■ As the district court realized, and as Harryman concedes, the finding of a *Miranda* violation does not end our inquiry. It is well established that the admission of statements obtained in violation of *Miranda* may be said to constitute harmless error. *E. g.*, *Null v. Wainwright*, 508 F.2d 340, 343 (5th Cir.), *cert. denied*, 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975). *Cf. Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (admission of pre-*Miranda* confessions challenged as violative of Fifth and Sixth Amendments subject to harmless error rule).[12]

9. *Cf. Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (statements concededly obtained in violation of *Miranda* nevertheless admissible to impeach defendant's testimony at trial); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (same). In *Hass* and *Harris*, the Supreme Court allowed the impeachment inroad on *Miranda* only because it found the deterrent interests of *Miranda* outweighed by the "strong policy against countenancing perjury." *New Jersey v. Portash*, 440 U.S. 450, 458, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979).

10. *See* note 7, *supra*.

11. Even assuming *arguendo* that surprise could constitute a sufficiently compelling non-investigative purpose for questioning an accused who has not been informed of and waived his rights, and thus that an allegation of surprise would in a case such as this justify resort to the record, it is by no means clear that on this record we would find such an allegation adequately supported.

The initial police investigation in this case clearly raised suspicions that Harryman was a narcotics offender. The patrolmen who responded to Sandra Wood's first call testified that they thought that some of the belongings that Wood had removed from Harryman's room were narcotics paraphernalia. They called in two narcotics officers to assist them in making an additional but unsuccessful search. The patrolmen testified that, when they took the belongings that had been removed from Harryman's room to the police station, they put the purported paraphernalia and the rifle under separate tags "because we figured, my partner and I figured in our opinion they were separate offenses." Under then Texas law, unauthor-

ized possession of a hypodermic needle was itself a punishable offense. Uniform Narcotic Drug Act § 2(c), Tex. Penal Code Ann. art. 725b.

Just how much of this suspicion was communicated, over the radio, by Sandra Wood, or by his partner, to the officer who conducted the search of Harryman and actually asked him the question is unclear. Although the officer testified only to his knowledge of the burglary and theft suspicions, it could be inferred that he also knew that Harryman was suspected of a narcotics offense.

But even assuming that the officer had no inkling that Harryman was suspected of a narcotics offense, it is by no means clear that the discovery of the hidden condom surprised him. The officer did not testify that he was surprised. Further, a police chemist testified at trial that the police laboratory occasionally received for testing drugs that had been put in "similar type packaging."

12. *See, e. g., Thompson v. Wainwright*, 601 F.2d 768, 772 n.9 (5th Cir. 1979); *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1077 (2d Cir. 1977); *United States v. Lemon*, 550 F.2d 467, 471 (9th Cir. 1977).

Prosecutorial use of involuntary statements may never be treated as harmless error, *see Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290 (1978); *Chapman v. California*, 386 U.S. 18, 23 & n.8, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), but, as noted above, statements obtained in violation of *Miranda* are not *necessarily* involuntary. *See New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979); *Smith v. Estelle*, 527 F.2d 430, 431–32 (5th Cir. 1976) (on petition for

In contending that the unconstitutional use of his statement was not harmless error, Harryman relies most heavily on language in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). There the Supreme Court stated that a constitutional error in the admission of evidence cannot be said to have been harmless if there is "a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 86–87, 84 S.Ct. at 230. Harryman contends that in prosecutions such as his for crimes in which unlawful intent is an essential element, statements such as his are so overpoweringly incriminating that their improper admission into evidence, absent a properly admitted confession, inevitably gives rise to a reasonable possibility that the statement might have contributed to the conviction.

■ This contention has no merit. As the Supreme Court made clear in *Fahy* and in every constitutional harmless error case that it has decided since, the question of whether or not a constitutional error was harmless cannot be answered by considering the error in isolation.[13] As the Court stated in *Fahy*, "it is necessary to review the facts of the case and the evidence adduced at trial" to determine the effect of the unlawfully admitted evidence "upon the other evidence adduced at trial and upon the conduct of the defense." 375 U.S. at 87, 84 S.Ct. at 230, 231. A court must then decide whether, absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt. *E. g., Brown v. United States*, 411 U.S. 223, 230–32, 93 S.Ct. 1565, 1569–70, 36 L.Ed.2d 208 (1973); *Milton v. Wainwright*, 407 U.S. 371, 377–78, 92 S.Ct. 2174, 2177–78, 33 L.Ed.2d 1, (1972); *Schneble v. Florida*, 405 U.S. 427, 431–32, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 346 (1972); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 25–26, 87 S.Ct. 824, 828–829, 17 L.Ed.2d 705 (1967); *Fahy v. Connecticut*, 375 U.S. at 91–92, 84 S.Ct. at 232–233.[14]

■ Although we recognize that this is an exacting standard that must be uncompromisingly applied, we have no difficulty in concluding that it is satisfied here. There is no question that the statement

13. Consideration of an error in isolation is appropriate only if the error is of such a nature that the harmless error rule does not apply. *Chapman v. California*, 386 U.S. 18, 23 & n.8, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (citing "some constitutional rights so basic that their infraction can never be treated as harmless error"). *See also Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978); *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 58 L.Ed.2d 339 (1976). As explained above, it is well established that violations of *Miranda* do not fall within this category.

14. In *Fahy* and in *Chapman*, where the Court concluded that the constitutional error complained of could not be said to have been harmless, the "independent" evidence, as the Court described it in *Brown* and in *Schneble*, or the evidence "fairly established," as the Court described it in *Milton*, was not overwhelming. In *Fahy*, the petitioners had been convicted of wilfully injuring a public building by painting

rehearing and rehearing en banc) (discussing difference). The record in this case reflects no indication that Harryman's statement was involuntary. Harryman does not claim that it was.

swastikas on a synagogue. The Court determined that the only untainted evidence connecting the petitioners to the crime was the testimony of a police officer that he had stopped their car for driving without lights near the scene of the crime at about the time it was committed and found under their seat (the Court did not state whether or not this search was lawful) a can of paint and a paint brush. 375 U.S. at 87–92, 84 S.Ct. 230–232. In *Chapman*, the Court characterized the evidence as only "reasonably strong" and concluded that "absent the constitutionally forbidden comments [on the defendants' failure to testify], honest, fair-minded jurors might very well have brought in not-guilty verdicts." 386 U.S. at 25–26, 87 S.Ct. at 829. In *Harrington, Schneble, Milton* and *Brown*, the Court concluded that the evidence "fairly established" was overwhelming. *See, e. g., Harrington v. California*, 395 U.S. at 254, 89 S.Ct. at 1728 ("But apart from [the codefendant confessions admitted in violation of *Bruton v. United States*, 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] the case against Harrington was so overwhelming that . . . this violation of *Bruton* was harmless beyond a reasonable doubt").

admitted against Harryman was incriminating. That it was so is evidenced by the decision of one of the prosecutors to refer to it no less than three times in his closing argument to the jury. But it is plain that the fact that the statement was admitted had no effect on the other, physical evidence adduced against Harryman at trial.[15] That evidence, as indicated above, was overwhelming. A condom containing a white powdered substance was found secreted on Harryman's person.[16] Laboratory tests of the substance proved that it was a mixture of heroin, morphine and procaine.[17] Harryman's claim that if the statement had not been admitted the jury would have found more credible his attack on the chain of

custody of the condom is, like the attack itself, without substance.

Harryman claims, as did his counsel at trial, that the condom that was taken from his person by the police contained only milk sugar and that the police must have confused it at some point before the laboratory testing with another condom that was actually filled with heroin.

Harryman contends that such confusion was a reasonable possibility given the police chemist's testimony at trial that the police laboratory occasionally received for testing condoms or packages like them thought to contain narcotics. The chemist's testimony could in fact be read to indicate that a

15. It is also plain that the erroneous admission of the statement had no effect, much less an adverse effect, on the conduct of Harryman's defense. The theory of his defense was and continues to be that the substance in the condom taken from him by the police was milk sugar rather than heroin. At trial he relied solely on his counsel's attack on the chain of police custody of the condom. He did not present any evidence or testify in his own behalf. He does not allege that the erroneous admission of the statement somehow precluded him from introducing exculpatory evidence. He alludes to none. His only contention is that he might have testified in his own behalf. This contention is frivolous. If, as he claims, he would have testified that he thought the condom contained only milk sugar, it is settled that his statement to the officer would have been properly admissible for impeachment. See, e. g., Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Further, if Harryman had taken the stand, he would have risked use by the state of his prior criminal record. That record, as the prosecution proved at the punishment phase of Harryman's trial, was substantial. In July, 1952, Harryman was sentenced on three counts of robbery by assault (each five to ten years) and one count of unlawfully possessing a worthless draft (two years). In April, 1959, Harryman was sentenced on one count of burglary as a second offender (twelve years), two counts of burglary (each two to twelve years), three counts of theft (each two to ten years), one count of forgery (two to five years), and one count of unlawfully breaking and entering a coin-operated machine (one hour to three years). In January, 1969, Harryman was sentenced on one count of unlawful escape (five years). It was after hearing proof of this record that the jury, which could have recommended a prison sentence of only two years, assessed Harryman's punishment at life in a Texas penitentiary. See note 1, supra.

16. Harryman does not contest this fact.

17. The officer who discovered the condom on Harryman's person testified that he and his partner initialed it, tagged it and placed it in a locked evidence box at the Dallas police station at approximately 5:30 a. m. on September 8. Mary Peck, a police evidence room worker, testified that she took the condom out of the locked box sometime between September 8 and September 11, transferred it to the locked evidence room in which she worked and on September 11 "typed it up" to go to the police laboratory for analysis. She testified that she took it to the laboratory on September 12 and gave it to the receiving officer, J. F. Price. Price testified that he received the condom from Peck on September 12 and turned it over to E. H. Forrester, the police laboratory chemist, for analysis. Forrester testified that he received the condom from Price on September 12, and that he supervised an analysis of its contents. He testified that the condom had within it six powder-filled balloons, and that a laboratory employee had analyzed one of the balloons selected at random and found it to contain heroin, morphine and procaine.

Each of the participants in the chain of custody of the condom taken from Harryman—the officer who removed it from Harryman's person and dropped it in the locked evidence box, the police evidence room worker who took it from the box to the police laboratory, the laboratory receiving officer who gave it to the chemist, and the chemist who supervised the analysis of its contents—identified his or her mark on the condom presented by the prosecution at trial as the condom that had been tested positive for heroin. Pursuant to these identifications, the condom was admitted into evidence.

narcotics test had been conducted on another condom thought to contain narcotics at about the time Harryman's condom had been analyzed and had been negative.

Harryman contends that the confusion most likely occurred between the time police evidence room worker Mary Peck removed the condom from the locked evidence box and the time she "typed it up" for police laboratory analysis. *See* note 17, *supra*. Harryman cites Peck's testimony that she was new at her job, that she allowed other persons to come into the evidence room to talk to her, and that after she removed Harryman's condom from the locked evidence box to the locked evidence room it may have been several days before she "typed it up." Harryman claims, as his counsel argued to the jury, that "You, from the evidence, can reasonably deduce that there was more than one package like this in that room. Mary·Peck didn't tell you how, when she went back to the room, after one or two, three days, she was able to tell you that this was the package that she put in there from [the arresting officers]. All we know is that it set there then when it came time on September 11th, she typed up the papers  .   .  .. All right, was she careless in which package she picked up in that property room, or is, for that matter, did someone while they were talking to her move it. We don't know, but I submit to you, ladies and gentlemen, that a reasonable doubt is raised by the testimony .   .·"

This argument has no factual basis. Even assuming that it is reasonable to suppose that there was another condom in the locked evidence room with which Harryman's condom could have been confused, the record conclusively negates Harryman's claim that such confusion could have so occurred. The condom did not lie unidentified in the locked evidence room before Mary Peck "typed it up." Even ignoring the fact that the condom had on it the initials of at least one of the arresting officers (Harryman's counsel characterized these initials as "blurred" and "obliterated"), Mary Peck testified, in accordance with the arresting officers' testimony that

they had tagged the condom, that from the time she first saw it, it had attached to it an "offense sheet" that had been filled out by the officers who had made Harryman's arrest.

Harryman also contends, as his trial counsel argued, that a reasonable doubt as to the chain of custody of the condom was created by Mary Peck's failure to testify, even though no one asked her, where she stored the condom between the time she "typed it up" on September 11 and the time she took it to the laboratory on September 12; by the failure of the arresting officers to individually mark each of the six powder-filled balloons found by the laboratory inside the condom; and by the "totality of the circumstances."

We simply cannot agree. *See generally* note 17, *supra*.

There is no evidence in this case to justify any hesitation in declaring that the erroneous admission of Harryman's statement was harmless beyond a reasonable doubt.

AFFIRMED.

AINSWORTH, Circuit Judge, with whom RONEY and FAY, Circuit Judges, join, specially concurring:

I concur in the result and in denial of the writ of habeas corpus herein. Nevertheless, I do not join the Court's opinion because I disagree with its holding that a *Miranda* violation has occurred in this case. In this regard I adopt the reasons with supporting authorities clearly set forth by Chief Judge Coleman in his dissent to the panel opinion in this case. *See* 597 F.2d at 930–31.

JAMES C. HILL, Circuit Judge, with whom FAY, Circuit Judge, joins, specially concurring:

In view of the majority's second holding, that the error was harmless, resolution of the *Miranda* issue was unnecessary. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936). Since a majority of the court has chosen to reach the issue, I concur in

Judge Reavley's opinion and add the following observations.

There are two holdings by our Court in this case. First, in a "punch list" application of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the majority concludes that the constable blundered and that the defendant's acknowledgment that the package contained heroin was inadmissible. Having vindicated the prophylactic and judicially convenient rule of *Miranda*, we repair to the even more convenient "harmless error" rule to forgive the prosecutor for having used that which we condemn the constable for having obtained. Inasmuch as I dissent from both holdings of our majority, I concur in the result. No maxim is sacred. Two wrongs do, I assert, make a right.

In finding that a *Miranda* violation occurred in this case, the majority holds that no statement made in response to an officer's excited utterance is admissible if the excited utterance is properly followed by a question mark when transcribed. The response will be admitted only if the officer was able to postpone his shock and surprise until the *Miranda* warnings have been read.

The majority expresses an unwillingness to "bend" *Miranda* in this situation. My view is that no bending is required, for *Miranda* does not, I suggest, apply to the excited utterance of a police officer. I come to this conclusion because I think it is clear that *Miranda* restricts "interrogation" of an unwarned arrestee and nothing more. The crucial issue then is what constitutes interrogation. Certainly, interrogation is not synonymous with questioning. Although the two may often coincide, interrogation may occur though no questions be asked. *See, e. g., Brewer v. Williams*, 430 U.S. 387, 399–400, 97 S.Ct. 1232, 1239–1240, 51 L.Ed.2d 423 (1977); *People v. Sanders*, 55 Ill.App.3d 178, 13 Ill.Dec. 186, 370 N.E.2d 1213, 1217 (1977); *State v. Innis*, 391 A.2d 1158, 1162 (R.I.1978); *Ochoa v. State*, 573 S.W.2d 796, 800–01 (Tex.Ct.Cr.App.1978); *State v. Boggs*, 16 Wash.App. 682, 559 P.2d 11, 15 (1977). As Judge Reavley's opinion demonstrates, the type of interrogation for-

bidden by *Miranda*, does not occur where, though a question be asked, it does not have an investigatory purpose. *See, e. g., United States v. Castellana*, 500 F.2d 325, 326 (5th Cir. 1974) (en banc); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112–13 (2d Cir. 1975); *United States v. Menichino*, 497 F.2d 935, 941 (5th Cir. 1974).

Clearly, therefore, we cannot decide cases such as this solely on whether the officer's statement has at its end a question mark or a period. We can, however, look objectively at the officer's conduct and determine whether or not the arrestee was interrogated. *See United States v. Lewis*, 425 F.Supp. 1166, 1176 (D.Conn.1977). If it is clear that the officer was bent upon obtaining information about criminal activity, the officer was engaged in interrogation. If the officer's statement, whether framed as a question or not, was the product of shock or surprise, it cannot be said that he was seeking information, and I would find that he was not engaged in interrogation.

Thus, if an officer responds to a loud noise by saying "What's that?", I suggest that an answer such as "I dropped my pistol" would be admissible in a prosecution for unlawful possession of a firearm. On the other hand, if an officer sees a gun lying on the ground and says "does that gun belong to you," the answer would not be admissible if the *Miranda* warnings had not yet been given. I therefore dissent from the majority's holding that *Miranda* requires exclusion of statements given in response to the excited utterance of a police officer.

Having held that the appellant was unconstitutionally compelled to incriminate himself, our majority moves on to the courtroom and is not so demanding of the procedures there. The arresting officer, the prosecutor, and the trial judge are all said to have contributed to a violation of the appellant's constitutional rights. The initial mistake was made by a police officer in the course of making an arrest in the motel lobby. The second was made jointly by a trained government attorney and a trial judge in a "temple of justice." I disagree

with the majority's finding of harmless error; I would hold procedures in the courtroom to a higher standard than those in a motel lobby.

The concept of harmless error is a difficult one. Often the defendant against whom the evidence appears to be overwhelming is more in need of protection than is one against whom the evidence is slight. A defendant cloaked with but few protections may be more harmed by the removal of one than he who has a multitude of potential defenses available.

Here, appellant's only defense was that the substance analyzed and found to be heroin by the government's chemists was not the same substance that was taken from him. It was an uphill battle, but he was entitled to try. His chance of creating a reasonable doubt in the minds of the jurors would have been infinitely greater if the prosecution had not been permitted to show that he had admitted that the substance was heroin. The use of the admission helped the prosecutor disprove appellant's "chain of custody" defense. Errors that materially help the prosecutor, which from his point of view might be described as "helpful errors," can hardly be said to have been harmless to the defendant.

In this case, the admission held to have been unconstitutionally extracted from the defendant would have been enough to convict. *See United States v. Crisp*, 563 F.2d 1242, 1244 (5th Cir. 1977); *United States v. Quesada*, 512 F.2d 1043, 1045–46 (5th Cir.), *cert. denied*, 473 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975). Certainly, it sufficed to remove any doubt his counsel may have created, because it amounted to confirmation of the chemist's analysis by the defendant himself. Every argument concerning the government's failure to prove that the substance was heroin was met by the compelling fact that the defendant had, after all, admitted that it was heroin.

In my view, Harryman's admission harmed his chance of successfully defending against the charge. It should have. It was his voluntary statement, not unconstitutionally obtained. The rule of *Miranda* does not prevent us from so finding.

Therefore, I concur in the result affirming the conviction.

REAVLEY, Circuit Judge, with whom BROWN, AINSWORTH, RONEY, GEE, TJOFLAT, HILL, FAY and HENDERSON, Circuit Judges, join, specially concurring:

My difference is with the majority's holding that the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were violated in the Texas court.

Perhaps police policy should rigidly require that the *Miranda* warning be given prior to asking any and all questions. For example, the one in custody stands with a vacant stare, but instead of asking "Can you hear me?" or "What is the matter?" or "Where are your glasses?" the warning must be given. That policy, or one of similar simplicity but a bit more reasonableness, would meet the practical and unmistakable demands of police procedure. And perhaps prosecutors, at a time when the rulings against "involuntary" self-incrimination have become so extensive, should exercise better judgment than to elicit testimony of words that came from the defendant unless necessary to prove his guilt. It is not my present concern, however, to discuss correct practices of police or prosecutors. Nor do I particularly enjoy adding to the volumes of judicial debates over whether evidence was admissible or inadmissible but harmless.

It has become the duty of this court to decide whether the elaborate trial and appeal through the courts of Texas should be condemned or even nullified. Unless the constitutional rights of the convicted person require that intervention, it cannot be justified. I do not find it justified in the present case.

In the early morning of September 8, 1972, Dallas police officers Raz and Conway responded to a radio-dispatched burglary call and arrived at the Oak Cliff Travel Lodge. There, on the basis of information provided them by an assistant manager of the inn, they arrested Harryman on suspicion of burglary and of theft of a rifle

found in his room, as well as of the automobile he was driving. In the course of the routine pat-down body search incident to the suspect's arrest, officer Conway turned up an object—a condom, stuffed with other condoms filled with a powdery substance, all stashed inside Harryman's trousers, hanging from the trousers' waistband at the small of his back. Upon discovering this uncommon parcel, officer Conway remarked, "What is this?" To which Harryman responded, "Oh, you know what it is. It is heroin." The routine search having been undertaken immediately upon Harryman's arrest, he had at that point received no *Miranda* warning. The majority holds this exchange between Conway and Harryman, and its proof at trial, to have been proscribed under *Miranda*.

*Miranda* applies only to "custodial interrogation." 384 U.S. at 444, 478–479, 86 S.Ct. at 1629–1630. Since Harryman had been arrested at the time of his exchange with officer Conway, the only remaining question is whether that exchange constituted "interrogation" forbidden by *Miranda*. In making this determination it is essential that we not lose sight of the abuses of police overreaching that the *Miranda* Court sought to avoid by its prescribed

warning. *See United States v. Jimenez*, 602 F.2d 139, 144 (7th Cir. 1979) ("The extent to which *Miranda* applies to street encounters . . . depends on whether these encounters reflect the type of inherently coercive tactics that may often attend a station-house interrogation."). *See also, Miranda v. Arizona*, 384 U.S. at 445–58, 86 S.Ct. at 1612–1619 (detailing the various psychological, coercive tactics used in "interrogation").

The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody . . . ." 384 U.S. at 444, 86 S.Ct. at 1612. Yet, courts and commentators alike have agreed that *Miranda* should not be applied as broadly as this definition, read in isolation, might literally suggest. Rather, the majority of courts have recognized that the prescriptions and proscriptions of *Miranda* in light of the factual and historical background that the Court there considered, apply only to *investigative* custodial questioning, aimed at eliciting evidence of a crime.[1] *Miranda* was not directed at non-investigative questioning, incident to routine police func-

1. *United States v. Grant*, 549 F.2d 942, 946 (4th Cir. 1977), *cert. denied*, 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1978) (*Miranda* "only inhibits investigative interrogation related to the specific crime itself."); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976) ("[T]he Supreme Court was concerned with protecting the suspect against interrogation of an investigative nature . . . ."); *United States v. Castellana*, 500 F.2d 325, 326 (5th Cir. 1974) (en banc; upheld admissibility of responses where the officer "was not interrogating Castellana in an attempt to elicit evidence of a crime."); *United States v. Menichino*, 497 F.2d 935, 940–41 (5th Cir. 1974) (*Miranda* bars proof of "[i]ncriminating statements elicited by law enforcement officers through questions relating to the criminal activity itself . . . ."); *United States v. La Monica*, 472 F.2d 580, 581 (9th Cir. 1972) (admitted response to question where "suspect was [not] interrogated for the purpose of eliciting an incriminating statement" and the officer "was not seeking evidence."); *Utsler v. Erickson*, 440 F.2d 140, 143 (8th Cir.), *cert. denied*, 404 U.S. 956, 30 L.Ed.2d 272 (1971) ("The question asked did not seek to . . . secure any

admission or confession . . . ."); *United States v. Lewis*, 425 F.Supp. 1166, 1176 (D.Conn.1977) ("a useful standard is whether the police conduct was 'expected to, or likely to, evoke admissions.'"). Model Code of Pre-Arraignment Procedure § 140.8(5) (1975); Kamisar, *Brewer v. Williams, Massiah, and Miranda: What Is Interrogation? When Does It Matter?* 67 Geo.L.J. 1, 6–7 & n. 41 (1978); Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?* 25 S.C.L.Rev. 699, 704–05 (1974). *Contra, Proctor v. United States*, 404 F.2d 819, 820–21 (D.C. Cir. 1968) (*Miranda* applies to all custodial questioning, regardless of benign purpose or potential).

Certainly the intent or capacity to elicit incriminating responses is the key criterion in determining whether *statements* made by officers to arrestees, though not cast in interrogatory form, nonetheless constitute "interrogation" for purposes of *Miranda* and other related cases. *See, e. g., Brewer v. Williams*, 430 U.S. 387, 399, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 432 (1977); *United States v. Jordan*, 557 F.2d 1081, 1084 (5th Cir. 1977).

tions, bearing no resemblance to traditional station house interrogation.[2]

Accordingly, this court, sitting en banc, has previously upheld the admissibility of a detainee's acknowledgment that he possessed firearms and his production of these firearms, both in response to a query put by an officer before giving *Miranda* warnings. *United States v. Castellana*, 500 F.2d 325, 326 (5th Cir. 1974). The question was asked incident to a lawful search of the detainee's premises, not to elicit evidence of a crime but to assure the safety of the officers. *Id.* at 326–27.

Similarly, several courts have upheld the admissibility of responses to routine questions asked during the booking and processing of arrestees and their belongings either before *Miranda* warnings had been given or after the suspect had requested a lawyer or indicated an intent to remain silent. *Accord*, Kamisar, *supra* note 1, at 7 & n. 41 ("There is general agreement that *Miranda* does not apply to 'administrative questioning.'"); Smith, *supra* note 1, at 704. In *United States ex rel. Hines v. La Vallee*, 521 F.2d 1109, 1112 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976), for example, a rape suspect being transported to the police station in a squad car responded to "questions designed to pass the time" by giving specific information about his marital status and children that later proved to be incriminating. The officers had not given the suspect the prescribed *Miranda* warnings. The Second Circuit, nonetheless, ruled the response admissible, citing a draft of the ALI Model Code of Pre-Arraignment Procedure § 140.8(5), *supra* note 2, and stat-

ing that in *Miranda*, "the Supreme Court was concerned with protecting the suspect against interrogation of an investigative nature rather than the obtaining of basic identifying data required for booking and arraignment [such as marital status]." *Id.* at 1112–13. *Accord, United States v. Prewitt*, 553 F.2d 1082, 1085–86 (7th Cir.), *cert. denied*, 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977) (admission of an alias during booking is not within *Miranda* rule). *Cf. Cannistraci v. Smith*, 470 F.Supp. 586, 589–91 (S.D.N.Y.1979) (similar dialogue in squad car held not to be proscribed interrogation).

In this same vein of administrative inquiry are questions incident to the inventorying and processing of the belongings of an arrestee. In *United States v. La Monica*, 472 F.2d 580 (9th Cir. 1972), while inventorying the personal effects of an arrestee, an officer discovered a receipt and asked, "What does this mean?" *Id.* at 581. The arrestee, who had earlier pretermitted further interrogation until his attorney arrived, gave an incriminating response. In finding the question and response not subject to *Miranda*, the Ninth Circuit said, "The officer who asked La Monic [*sic*] about the receipt was not seeking evidence but was trying to identify and inventory La Monica's personal effects." *Id. Accord, Parson v. United States*, 387 F.2d 944 (10th Cir. 1968) (where sheriff asked arrestees for keys to their car in order to move it off the street, absence of *Miranda* warnings did not require suppression of their response that car was stolen.)[3]

---

**2.** The American Law Institute, in its Model Code of Pre-Arraignment Procedure § 140.8(5) (1975), explicitly recognized this dichotomy by recommending that *Miranda*-type warnings by given only prior to "questioning designed to investigate crimes or the involvement of the arrested person or others in crimes." The notes of the drafters following this section reiterate that warning requirements are "not intended to apply to routine questions by the police unrelated to the investigation of the case." *Id.* at 53.

**3.** *Miranda* also does not apply to general on-the-scene questioning as to the facts surrounding a crime. *Miranda v. Arizona*, 384 U.S. at

477, 86 S.Ct. at 1629. This is true even where the interviewee immediately thereafter is arrested and prosecuted—partially on the basis of his responses. For an extreme example, see *United States v. Dunnings*, 425 F.2d 836, 838 n. 1 (2d Cir. 1969), *cert. denied*, 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970). There, officers burst into an apartment pursuant to a search warrant and discovered a pile of white powder between the feet of one of the apartment's two occupants. One officer asked what the substance was, and the occupant replied before any *Miranda* warnings were given. The exchange was upheld under the rubric of general on-the-scene questioning. *See also, e. g.,*

The foregoing are examples of custodial questioning that courts, including our own, have held not to be subject to *Miranda* because they are not investigative in nature. The majority seeks to minimize this precedent, intimating that these courts grudgingly granted narrow exemptions from the broad mandate of *Miranda* confined to the facts of each particular case. The majority states that "[w]here a state has alleged that there was a sufficiently compelling noninvestigatory purpose for asking questions of an accused . . . , we have bent *Miranda* . . . ."

Yet, the state interest in many of the mundanities of booking a suspect and inventorying his belongings can hardly be characterized as sufficiently "compelling" to exact exemption from a constitutionally based rule. A more consistent explanation is that the existence of a *non*-investigative function (compelling or no) for these routine or incidental questions does not require the affirmative creation of an *exemption* to *Miranda*, but rather, by implicitly contradicting investigation or the existence of investigative purpose, it removes the questions from the genre intended to be regulated by *Miranda*. That is to say, the foregoing cases are not discrete *exemptions* to the operation of *Miranda*; instead, they are concrete examples of a class of routine inquiry—non-investigative questioning incidental to other police functions—to which *Miranda* simply is not directed.

Officer Conway's "What is this?" simply provides another example of this type of inquiry. The question was incidental to Conway's routine search of the arrestee, Harryman, before placing him in the squad car. *See Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–2040, 23 L.Ed.2d 685 (1969). The ascertainment of the na-

ture of items found on the arrestee in the course of such a search is closely akin to inquiries addressed to the accused during booking and inventorying of his personal belongings. The question would have been proper if asked in the process of listing those belongings before Harryman entered jail. If proper there, why not here?

The question could well have been a spontaneous reaction of surprise to the unique cache, as suggested by Chief Judge Coleman in his dissent to the panel opinion. 597 F.2d at 931. It may just as logically have been prompted by the officer's need to determine if the item belonging to the arrestee required special handling, either at the scene or in the property inventory at the police station. Was the substance dangerous? Valuable? Perishable? Such a question is of a routine and non-investigative nature, bordering on being merely administrative. Conversely, as Judge Gee observed in *Castellana*, 500 F.2d at 326, "[n]o rational investigatory purpose could have prompted such a question" when the officer had lawfully discovered and seized the parcel and the whole panoply of police analytical and investigative tools was then available to decipher the package's contents.[4]

I, therefore, disagree with Part I of the majority opinion. I would hold the exchange between officer Conway and Harryman to have been non-investigative, incidental to a routine non-interrogative police function, and not within the strictures of *Miranda*. I concur in the affirmance of the conviction.

THOMAS A. CLARK, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Harryman's *Miranda* rights were violated by the

---

*Borodine v. Douzanis*, 592 F.2d 1202 (1st Cir. 1979); *United States v. Marzett*, 526 F.2d 277, 278 (5th Cir. 1976) (Officer asked shooting suspect, "Where is the gun, John?"); *United States v. Barnes*, 464 F.2d 828, 829–30 (D.C. Cir. 1972), *cert. denied*, 410 U.S. 986, 93 S.Ct. 1514, 36 L.Ed.2d 183 (1973). These cases, however, are properly analyzed under the custody, rather than interrogation, prong of "custodial interrogation." The interviewee must be found

not to have been under the coercive onus of police detention, since such questioning is plainly intended to elicit evidence of the crime.

4. Harryman's "knowing" possession of the contents could be readily inferred, indeed such an inference would be compelled, from the purposefully secretive manner in which he had concealed the parcel on his body.

prosecution's repeated use of his statement at trial, and I completely concur in Part I of Judge Johnson's thorough opinion. I part company with the majority, however, in its conclusion that the error was harmless. My reading of the Supreme Court cases upon which the majority's analysis relies convinces me that the wrong standard of review has been applied to Harryman's claim of prejudice. I therefore dissent from Part II of the majority opinion.

The standard of review the majority uses requires the reviewing court to "decide whether, absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt." *Supra,* p. 876. This is an easy enough standard to employ: The appellate judge, sitting, as it were, as a thirteenth juror, reviews the sufficiency of the nonobjectionable evidence introduced at trial and either affirms or reverses as he or she would vote either to convict or to acquit. The majority refers to six cases in support of its position on harmless error review: *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). A close reading of these cases reveals instead that they do not support the majority's interpretation. Indeed, the earliest of these, *Fahy,* expressly rejects the approach taken by the majority in favor of a yet more exacting standard, and none of the cases following can be said to have qualified the policy set forth in *Fahy.*

*Fahy v. Connecticut, supra,* applied a common sense rule of harmless error, one which looks to whether the objectionable evidence might have contributed to the conviction. There the Supreme Court concluded

that the erroneous admission of this unconstitutionally obtained evidence at this petitioner's trial was prejudicial; therefore, the error was *not* harmless, and the conviction must be reversed. *We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of.* The question is whether there is a reasonable possibility that the evidence complained of *might have contributed* to the conviction.

375 U.S. at 86–7, 84 S.Ct. at 230 (emphasis added). The majority concedes the prejudicial impact of the erroneous and repeated use of Harryman's statement by the prosecution. But in relying on the strength of the rest of the State's case against Harryman, the majority ignores the Supreme Court's express directive that we must consider whether the erroneously admitted evidence might have contributed to the conviction. Judge Hill's concurrence points accurately to the impact of a confession on a jury.

None of the cases following *Fahy* has relaxed the standard of review of similar errors of constitutional criminal procedure. Four years after *Fahy* the Court had to decide in *Chapman v. California, supra,* whether a California murder conviction which had been obtained in violation of the Court's recent ruling in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), had also amounted to harmless constitutional error. In reaffirming the standard enunciated in *Fahy,* the Court concluded that "[a]n error in admitting plainly relevant evidence *which possibly influenced the jury adversely to a litigant* cannot, under *Fahy,* be conceived of as harmless." 386 U.S. at 23–4, 87 S.Ct. at 828 (emphasis added). Thus, even though the rest of the State's case is overwhelming, constitutional error in the admission of evidence cannot be harmless if it nevertheless has a prejudicial impact on the deliberations of the jury. The *Chapman* Court expanded on the requirements for a showing of harmless error, adding the elements of who had the burden of proof on the issue of harmless error (the "beneficiary of a constitutional error," *id.*)

and how great a burden that was on review (proof of harmlessness "beyond a reasonable doubt" *id.*).

In *Harrington v. California, supra,* the issue was whether the California trial court had committed harmless error in admitting into evidence against Harrington the confessions of two nontestifying codefendants who were, consequently, not subject to cross-examination, contrary to the Court's recent decisions in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In finding no prejudicial error in Harrington's conviction, Justice Douglas did not qualify the *Chapman* standard of review. Indeed, he expressly reaffirmed it:

> Our judgment must be based on our own reading of the record *and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury.* We admonished in *Chapman* . . . against giving too much emphasis to "overwhelming evidence" of guilt, stating that constitutional errors affecting the substantial rights of the aggrieved party could not be considered to be harmless. . . .
>
> We do not depart from *Chapman*; nor do we [delete] it by inference. We reaffirm it.

395 U.S. at 254, 89 S.Ct. at 1728 (emphasis added).[1]

Each of those cases coming after *Harrington* was decided on precisely the same basis as was Harrington's. *See Schneble v. Florida,* 405 U.S. at 429, 92 S.Ct. at 1058,[2] *Milton v. Wainwright,* 407 U.S. at 373, 92 S.Ct. at 2175,[3] and *Brown v. United States,* 411 U.S. at 226, 93 S.Ct. at 1568.[4]

The proliferation of dicta in these cases has led the majority into applying the wrong standard of harmless error review. Unnecessary language seems to invite review of the sufficiency of the nonobjectionable evidence *alone,* even though our attention over and over again is *properly* called to the prejudicial impact of the objectionable evidence. Thus, we read in *Harrington* that the case against Harrington was "so overwhelming that unless we [can] say that no violation of *Bruton* can constitute harmless error, we must leave this state conviction undisturbed," 395 U.S. at 254, 89 S.Ct. at 1729; in *Schneble* that "[i]n this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the [nontestifying codefendant's] admissions been excluded," 405 U.S. at 432, 92 S.Ct. at 1060; in *Milton* that "[our] review . . . leaves us with no reasonable doubt that the jury at petitioner's 1958 trial would have reached the same verdict without hearing [the interrogating officer's] testimony," 407 U.S. at 377, 92 S.Ct. at 2178; and in *Brown* that "[t]he testimony erroneously admitted was merely cumulative of other overwhelm-

1. Confining his analysis to "these special facts," 395 U.S. at 253, 89 S.Ct. at 1728, Mr. Justice Douglas concluded that *Chapman* was satisfied: All four defendants had confessed to more or less of the State's case. A nonobjectionable admission by Harrington placed him at the scene of the crime. The confessions of two codefendants, Bosby and Cooper, however, merely placed someone of the same race as Harrington at the scene of the crime. (Harrington was white, all three codefendants were black.) It was to those portions of those codefendants' confessions, that "a white guy" was also at the scene of the crime, that Harrington based his *Bruton* objection, on the ground that *those codefendants did not take the stand.* But, as the court concluded, any error in admitting the uncontradictable confession-testimony of Bosby and Cooper was completely submerged in Harrington's own admissible confes-

sion, admitting in whole the contents of those codefendants' testimony against him.

2. Where the Court expressly assumed that the content of the codefendant's admission was merged into certain admissions made by Schneble and that "these admissions were properly before the trial court."

3. Where the testimony objected to was merged into "no less than three full confessions" whose validity and, apparently, admissibility were not challenged on appeal.

4. Where the *Bruton* error was harmless in light of the fact that "[t]hose considerable parts of each petitioner's confession which did not implicate the other were admitted without objection."

ing and largely uncontroverted evidence properly before the jury," 411 U.S. at 231, 93 S.Ct. at 1570. Yet each of these cases cites *Chapman* approvingly, applying the *Chapman* standard of review.

This interpretation of the standard of review for constitutional error is buttressed by the fact that review of nonconstitutional error in the federal courts has focused for the past thirty years on the impact of the alleged error in light of the surrounding circumstances, notwithstanding the sufficiency of the independent evidence.[5] In construing the statutory predecessor to the harmless error provision in the Federal Rules of Criminal Procedure,[6] the Supreme Court in 1946 regarded the question of harmless error as not whether "they [the jury] were right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557.

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. . . . But if one cannot say, with fair assurance, after pondering all that happened *without stripping the erroneous action from the whole*, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.* It is

rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.*, 328 U.S. at 764–65, 66 S.Ct. at 1248 (citation and footnote omitted, emphasis added). *See, generally*, Wright, Federal Practice and Procedure, Criminal §§ 852–55. The *Fahy* and *Chapman* Courts were not writing on a clean slate when their turn came to assess the harm in constitutional errors, for the standard of review they applied was no more rigorous, nor less exacting, than that already applicable to errors of a nonconstitutional variety.[7]

In any case the amount of the independent, nonobjectionable evidence is certainly relevant in assessing whether an asserted error is harmless. The same error would, of course, figure more largely in a close case than in an easy one. But although highly relevant, overwhelming independent evidence of the guilt of the accused is not enough, under *Fahy* and *Chapman*, for a finding of harmless constitutional error. However overwhelming the evidence against the accused, error cannot be harmless if prejudicial impact is conceded. Any more lax standard of harmless error review, such as that used by the majority, does not follow the rule in the cases discussed above. Moreover, such a standard of harmless error candidly concedes that the rule of law, here Harryman's right to have the jury weigh the evidence against him free of the damaging impact of the admission proscribed by *Miranda*, varies as between the clearly guilty and the not-so-clearly guilty.

The majority in Part I of the opinion rightfully states that the rigidity of the *Miranda* rule is its core strength. Policemen, prosecutors, and trial courts should

---

**5.** Harryman's appeal, of course, is from a denial of habeas relief from a state court conviction. There is no reason why harmless error in the context of federal criminal appeals is any less applicable here, where the error committed by the Texas trial court was a failure to apply federal constitutionally mandated criminal procedure.

**6.** "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." F.R.Crim.P. 52(a).

**7.** In *Kotteakos*, e. g., the Court reversed convictions for conspiring to obtain fraudulent loans under the National Housing Act. The Court found reversible error under the standard it enunciated even though the lower court, Learned Hand, J., had "painstakingly examined the evidence relating directly to each of the petitioners[,] found it convincing to the point of making guilt manifest [, . . . ] and concluded that reversal would be a miscarriage of justice." 328 U.S. at 775, 66 S.Ct. at 1253.

have rules that are not bent by appellate courts granting so many exemptions that the rule becomes meaningless. In Part II of the opinion I think the majority bends the *Chapman* harmless error rule. We become the thirteenth juror. We should confine ourselves to answering the question: Was there a reasonable possibility that the inadmissible evidence contributed to the conviction? The majority concludes in this case that there was by saying: "There is no question that the statement admitted against Harryman was incriminating. That it was so [was] evidenced by the decision of one of the prosecutors to refer to it no less than three times in his closing argument to the jury." *Supra*, pp. 876–877. If the *Chapman* rule remained rigid, prosecutors would win their cases with their additional "overwhelming evidence of guilt" without infecting the case with the unneeded constitutionally questionable evidence.

The panel majority concluded that the State failed to carry its burden of demonstrating beyond a reasonable doubt that the error complained of did not contribute to the verdict. Since this standard was correct both in principle and in authority, I would affirm the panel's decision reversing the district court's denial of habeas relief. Accordingly, I respectfully dissent.